33 A.3d 555

**500 JAMES HANCE COURT and Knauer and Gorman Construction Co., Inc.**

v.

**PENNSYLVANIA PREVAILING WAGE APPEALS BOARD**

Bureau of Labor Law Compliance, Intervenor.

Appeal of Bureau of Labor Law Compliance, Intervenor.

Supreme Court of Pennsylvania.

Argued March 9, 2011.

Decided Nov. 23, 2011.

240

James A. Holzman, PA Department of Labor & Industry, Jane Pomerantz, Department of Labor and Industry, Harrisburg, for Bureau of Labor Law Compliance.

Carl A. Ammerman, Jay R. Lantzy, Richard C. Lengler, PA Department of Labor & Industry, Harrisburg, for Pennsylvania Prevailing Wage Appeals Board.

Joseph J. Dougherty, Lyons, Dougherty, Shaffer & Schneider, LLC, Chadds Ford, Joseph T. Doyle, Brian LeGrow, Law Offices of Vincent B. Mancini & Associates, Media, for 500 James Hance Court, L.P. and Knauer and Gorman Construction Co. Inc.

Samantha Sherwood Bononno, Thomas Richard Davies, Harmon & Davies, for Appellee Amicus Curiae, Keystone Chapter Associated Builders and Contractors, Inc.

Kevin Michael McKenna, Latsha, Davis, Yohe & McKenna, P.C., for Appellee Amicus Curiae, PA Coalition of Public Charter Schools.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

*OPINION*

Justice SAYLOR.

The issue of public importance centering this appeal is whether, under the Pennsylvania Prevailing Wage Act, a pre-development lease involving a charter school may implicate wage regulation in the ensuing construction of the leased premises.

## I. Background

### A. Parties and Interested Entities

The appellant is the Bureau of Labor Law Compliance (the "Bureau"), a unit of the Department of Labor and Industry (the "Department"), which is the Commonwealth agency charged with administration and enforcement of the Pennsylvania Prevailing Wage Act.[1] The appellees are 500 James Hance Court, L.P. ("Developer"), which operates as a commercial real estate developer, and Knauer and Gorman Construction Co., Inc. ("Contractor") (collectively, with Developer, "Appellees").

The Collegium Foundation (the "Foundation") is a Pennsylvania nonprofit corporation which acts as a support organization for the Collegium Charter School (the "School"). The School, also a non-profit corporation, operates a charter school within the West Chester Area School District under the Charter School Law.[2]

### B. Prevailing Wage Law, Generally

Under Section 5 of the Wage Act, "[n]ot less than the prevailing minimum wages as determined [under the Act] shall be paid to all workmen employed on public work." 43

1. Act of Aug. 15, 1961, P.L. 987 (as amended 43 P.S. §§ 165–1 to 165–17) (the "Wage Act," or, simply, the "Act").

2. Act of Mar. 10, 1949, P.L. 30, No. 14 (as amended 24 P.S. §§ 17–1701–A to 17–1751–A).

P.S. § 165–5. Public bodies proposing contracts for "any project of public work" are to request, from the Secretary of Labor and Industry, prevailing minimum wage rates (categorized by craft or classification of workers in the job locality) for incorporation into ensuing contracts. *Id.* §§ 165–4, 165–7. *See generally Borough of Youngwood v. PWAB,* 596 Pa. 603, 614, 947 A.2d 724, 730–31 (2008). In relevant part, a project is a "public work" if it is performed "under contract" and is "paid for in whole or in part" with public funds. 43 P.S. § 165–2 (definition of "public work"); *see Pa. Nat'l Mut. Cas. Ins. Co. v. PWAB,* 552 Pa. 385, 396–97, 715 A.2d 1068, 1074 (1998) (*"Penn National I "*). Pursuant to the Charter School Law, boards of trustees and contractors of charter schools are made subject to the provisions of the Act. *See* 24 P.S. § 17–1715–A(10)(iii). Given that there may be some disharmony in the application of some of the specific elements of the Wage Act in charter-school scenarios, the Commonwealth Court has held that such elements are not strictly applicable. *See Mosaica Educ., Inc. v. PWAB,* 836 A.2d 185, 189–90 (Pa. Cmwlth.2003) (*"Mosaica I "*). Under *Mosaica I,* the payment of charter-school funds to finance construction may suffice to trigger wage regulation. *See id.*

## C. Procedural and Factual History

On September 25, 2006, Developer entered into a construction management agreement with Contractor pertaining to the erection of a building at 500 James Hance Court, situated within the Oaklands Corporate Center in Exton, Chester County. According to the agreement, the contemplated, 68,-000–square–foot structure was to be used as an elementary charter school, and the project was denominated "Collegium Charter School."

On October 1, 2006, Developer and the Foundation entered into a long-term, pre-development lease pertaining to the above building,[3] containing an option to purchase after five

3. It appears that the Foundation and the School ultimately merged. *See In re Appeal of Collegium Found. & Collegium Charter Sch.,* 991 A.2d 990, 991 n. 1 (Pa.Cmwlth.2010). For purposes of the present appeal, at

years. The lease also required the Foundation to tender $1.6 million in the form of a specialized "security deposit," which Developer was to apply to acquire materials and equipment listed in the lease's "Exhibit E." As further developed below, Exhibit E was not made available to the reviewing tribunals until a recent production per this Court's directive. In any event, the document evidences that the $1.6 "security deposit" to be provided by the Foundation was dedicated largely to funding the procurement of materials necessary to the interior construction or "fit-out" of the building for the contemplated use as a charter school and related administrative offices. This is significant, in light of the Wage Act's application to projects "paid for in whole *or in part*" from public funds. 43 P.S. § 165–2 (definition of "public work") (emphasis added). Other than in terms of this allocation, this original lease did not differentiate materially between the infrastructure construction (referred to by the parties as construction of the building shell) and the fit-out.

On October 2, 2006, Contractor entered into a subcontract with Pancoast & Clifford, Inc. ("Subcontractor") for the physical construction of the building.

Soon after the lease and related contracts were executed, the Bureau notified the School that it was investigating the project to determine whether prevailing wages were required. In this regard, the Bureau explained that charter school construction is treated the same as a traditional school project for prevailing wage purposes. *See* Letter from Deputy Chief Counsel for the Bureau to the School Solicitor (Oct. 4, 2006), *reproduced in* Supplemental Reproduced Record ("R.R. Supp.") at 1b–3b. *See generally Mosaica I*, 836 A.2d at 189.

In its response, the School represented that Developer had intended to construct an office building at the 500 James Hance Court site before the Foundation and School expressed an interest in occupancy. *See* Letter from the School Solicitor to the Bureau (Oct. 24, 2006), *reproduced in* R.R. Supp. at 4b. Furthermore, the School observed that Developer bore the

least, there is no dispute that lease obligations undertaken by the Foundation also may be regarded as those of the School.

responsibility for construction of the building; accordingly, the School had not awarded (and would not award) any contract of construction. Given its lack of involvement in the construction activity, the School took the position that no "funds of a public body" would be used for construction. 43 P.S. § 165–2(5). Thus, according to the School, "[b]ased upon the foregoing, we believe that the Project is not a construction project or construction-related work of a charter school and ... is not subject to the requirements of the Prevailing Wage Act." R.R. Supp. at 5b. The School did not address the lease's allocation of a $1.6 million "security deposit" to the purchase of materials and equipment to be used in the construction.

On October 27, 2006, the Bureau issued a determination that prevailing wages were required for the project. The agency relied on the Foundation's involvement as the lessee; the intended use of the building as a charter school; rental payments by the School exceeding $600,000 annually; the option to purchase after five years; the $1.6 million "security deposit," which the Bureau had learned was to be financed by bonds issued in 2004 by the Chester County Industrial Authority; and the Foundation's obtaining of a leasehold mortgage (apparently as a condition to the use of the bond monies), as authorized under the lease terms. *See* Letter from Deputy Chief Counsel for the Bureau to the School Solicitor (Oct. 27, 2006), *reproduced in* R.R. at 14a–15a. By way of analogy, the Bureau explained that, under a federal prevailing wage law known as the Davis–Bacon Act,[4] a lease may implicate prevailing wage regulation. The Bureau referenced a multi-factored test employed by the United States Labor Department's Administrative Review Board to assess whether a long-term lease is a disguised public-works contract. *See In re Phoenix Field Office, Bureau of Land Mgmt.*, ARB Case No. 01–010, 2001 WL 944696 (June 29, 2001), *reproduced in* Brief for Intervenor at App. 4. This test, referred to below as the *Phoenix Field Office* test, examines: (1) the length of the

---

4. 46 Stat. 1494 (as amended 40 U.S.C. §§ 3141–3148). *See generally Frank Bros., Inc. v. Wis. Dep't of Transp.*, 409 F.3d 880, 883 & n. 1 (7th Cir.2005) (discussing the Davis–Bacon Act and its state counterparts).

lease; (2) the government's involvement in the construction project (e.g., whether the building is built to government requirements and whether the government has inspection rights as the work progresses); (3) the extent to which the structure will be used for private rather than public purposes; (4) whether construction costs will be fully paid by the lease payments; and (5) whether the contract is written as a lease solely in order to evade prevailing wage requirements. *See id.* at 8–11.[5]

On December 7, 2006, Appellees responded by lodging a grievance with the Pennsylvania Prevailing Wage Appeals Board (the "Board"), under Section 2.2.(e) of the Act. *See* 43 P.S. 165–2.2 (entitled, "Appeals Board, powers and duties"); 34 Pa.Code § 213.8 (entitled, "Grievances arising from administration of the act"). In their grievance and the accompanying papers, Appellees conceded for the first time of record that the interior construction of the building was subject to wage regulation. According to Appellees, however, Developer and the Foundation had structured their relationship to draw a close, material distinction between the interior construction and the erection of the building shell. In this respect, Appellees represented that the building fit-out was the sole responsibility of the Foundation and the School, to be undertaken at their sole cost and by their own contractor or contractors. *See* Proposed Facts on Behalf of Grievants, *In re 500 James Hance Court, L.P. & Knauer & Gorman Constr. Co.,* No. PWAB–8G–2006, at ¶ 15 (PWAB Jan. 12, 2007), *reproduced in* R.R. at 36a; *see also* Notice of Grievance, *In re 500 James Hance Court, L.P. & Knauer & Gorman Constr. Co.,* No. PWAB–8G–2006, at ¶ 14 (PWAB Dec. 7, 2006), *reproduced in* R.R. at 10a. By contrast, Appellees indicated, construction of the building shell was Developer's responsibility, was to be financed privately by it, and was to remain under Developer's

5. The test was first suggested in an opinion by the United States Department of Justice's Office of Legal Counsel, which further indicated that the five factors were not meant to be exhaustive. *See Reconsideration of Applicability of the Davis–Bacon Act to the Veterans Admin.'s Lease of Med. Facilities,* 18 U.S. Op. Off. Legal Counsel 109, 119 n. 10 (May 23, 1994) (*"Veterans Administration Lease "*).

ownership. As such, Appellees maintained that the shell construction was not a public work or otherwise subject to wage regulation, since there was no payment from public funds or funds of the Foundation or School. *See* 43 P.S. § 165-2 (definition of "public work"); 24 P.S. § 17–1715–A(10)(iii) (applicability of the Wage Act to charter school boards of trustees and contractors).

As noted, however, the existing lease made no such distinction between shell and interior construction, but rather, merely provided for the allocation of a $1.6 million "security deposit" to procurement of materials and equipment primarily for use in the interior construction. In their papers, Appellees did not discuss this "security deposit" arrangement under the existing lease or the discrepancies between their representations and the terms of such lease. Indeed, while purporting to provide this lease to the Board, *see* Exhibits on Behalf of Grievants, *In re 500 James Hance Court, L.P. & Knauer & Gorman Constr. Co.*, No. PWAB–8G–2006 (PWAB Jan. 12, 2007), in fact, they provided a different, unexecuted lease which mirrored their litigation position depicting a bifurcation between shell and interior construction. *See* Letter from Appellees' Counsel to the Board, No. PWAB–8G–2006 (PWAB May 19, 2008) (explaining that Appellees previously had provided an "unsigned copy of the Lease" and offering a subsequently-executed, modified Lease as the intended exhibit).[6]

Of additional significance, Appellees averred in their grievance that their plans to construct a building at 500 James Hance Court predated the Foundation's involvement. Appellees' proposed findings of fact were also to this effect.

On March 1, 2007, Developer and the Foundation consummated the amended lease embodying a bifurcation of shell and interior construction activities. The amended lease indicated that the security deposit provision was "[p]urposefully deleted." Amended Lease at ¶ 5 (Mar. 1, 2007). By this amend-

6. Contrary to counsel's representation, in point of fact, Appellees had provided an unsigned copy of *a different* lease, albeit (as developed below) one which was consummated two months after it was submitted to the Board.

ment, Developer and the Foundation conformed the facts to Appellees' existing representations about the lease's contents.[7] On the same day, Appellees amended their construction agreement to also reflect the bifurcation, and Developer obtained private financing for the shell construction, secured by a mortgage on the 500 James Hance Court property. The Foundation also entered into a sublease with the School pertaining to the building. Subsequently, the Foundation entered into a separate contract with Subcontractor for the interior construction, to be accomplished as a second and independent phase of the overall project.

To facilitate the Board's disposition of Appellees' grievance, and consistent with the applicable procedural regulations, the Bureau and Appellees executed a stipulation of agreed-upon facts on May 19, 2008. *See* 34 Pa.Code § 213.8(h). As concerns the lease relationship between Developer and the Foundation, the stipulation indicated: "On or about March 1, 2007, 500 James Hance Court and Collegium Foundation entered into a lease for the building." Stipulation of Fact & Authenticity of Documents, *In re 500 James Hance Court, L.P. & Knauer & Gorman Constr. Co.*, No. PWAB–8G–2006, at ¶ 5 (PWAB May 19, 2008) [hereinafter "Stip."]. No mention was made of the original lease (dated October 1, 2006), other than by way of an agreement that a copy attached to one of the Bureau's briefs was authentic. *See id.* at ¶ 18(b). The stipulation described Developer's construction of the building shell,[8] and indicated that the total cost of this construction

7. It should go without saying that Appellees should have conformed their representations to the facts in the first instance, rather than treating anticipated developments as if they already had occurred. Whether by inadvertence or artfulness, the blurring of the terms of the original and amended leases (which has continued through the present briefing) has contributed to inaccuracies in the administrative findings and ensuing judicial recitations and has substantially complicated the review process.

8. According to the stipulation, such construction

includes site work; chain-link fence; permanent seeding; cast-in-place concrete; unit masonry; structural steel; miscellaneous metals; carpentry; roofing and metal panel systems; sealants and caulking; doors, frames and hardware; windows, glass and glazing; gypsum

would be at least $5,117,120. *See id.* at ¶ 11. The fit-out also was discussed,[9] and the stipulation provided that the cost of completion was approximately $1,590,780, to be paid for from the proceeds of public (bond) financing. Furthermore, the stipulation misleadingly stated:

Pennsylvania prevailing wages were requested for construction of the "fit out." The Bureau issued rates for the project on August 25, 2006, Serial Number 06–6040.

Stip. at ¶ 16.[10]

Notably, as well, the stipulation was silent concerning Developer's asserted commitment to construct a building at 500 James Hance Court prior to the Foundation's involvement.

In their pre-decision briefs, Appellees' primary position was that the Charter School Law's extension of the Wage Act to "contractors of charter schools," 24 P.S. § 17–1715–A(10), requires a direct contract between a charter school and a contractor pertaining to the specific construction at issue. Appellees highlighted that no such agreement existed in their case. With regard to the occupancy arrangement for the building, Appellees described it as a "plain vanilla" commercial lease and argued that rent payments simply are not the equivalent of construction financing. Furthermore, Appellees contended, neither the purchase option nor the provision authorizing a leasehold mortgage brought the transaction within the Act's purview. *See* Supplemental Brief on Behalf of Grievants, *In re 500 James Hance Court, L.P. & Knauer &*

---

wallboard and ceiling systems; hydraulic elevator; fire suppression sprinklers; plumbing; HVAC; and electric.
Stip. at ¶ 10.

9. The stipulation indicates: "Construction for the 'fit out' includes electrical, installation of elevator, mechanical, plumbing, heating, walls, doors, fixtures, painting and equipment. This work commenced at or about the date the building shell was completed." Stip. at ¶ 14.

10. In point of fact, the record suggests that prevailing wages had not been "requested" of the Department in the relevant time frame; rather, the Bureau had determined that they should be imposed. Moreover, from the record, neither Appellees nor the Foundation or School appears to have conceded that any part of the project was subject to wage regulation prior to submission of Appellees' grievance in December 2006.

*Gorman Constr. Co.,* No. PWAB–8G–2006, at 7 (PWAB Jan. 12, 2007) ("The fact that the lease with [the Foundation] has an option to purchase and a leasehold mortgage provision bearing no legal consequence to the nature of the parties' present interests in the land is not evidence of or synonymous with collusion, subterfuge, or the creative financing and contract terms alleged by the Bureau."). Appellees also relied on *Mosaica Education, Inc. v. PWAB,* 925 A.2d 176 (Pa.Cmwlth. 2007) ("*Mosaica II* ") (holding, *inter alia,* that a charter school lease did not implicate the Wage Act, where there was no evidence that the school had any role in determining space and performance goals for the project, which was being pursued by an independent charter-school management company). Appellees also repeated their contention that Developer planned to construct a building on the premises for lease prior to the Foundation's involvement.

The Bureau, for its part, posited that the stream of lease payments to be provided by the Foundation or School was tantamount to construction financing. The Bureau's core position was that:

[T]his Project requires prevailing wages because it is undertaken for the sole purpose of constructing a building for an entity subject to prevailing wage requirements. The building's shell and interior are being constructed for the sole purpose of a[sic] building a charter school. The absence of other tenants, the lease containing the building's specifications and the Foundation's operation and payment for this building clearly indicate that charter school funds are being expended for the purpose of operating a charter school. These lease provisions mirror the provisions of leases for construction requiring federal prevailing wages. The lease is a construction contract.

Brief Opposing Grievance, *In re 500 James Hance Court, L.P. & Knauer & Gorman Constr. Co.,* No. PWAB–8G–2006, at 16–17 (PWAB Feb. 12, 2007). To this end, the Bureau again invoked the *Phoenix Field Office* test. Furthermore, the Bureau contested Appellees' position that construction would have occurred without the Foundation's involvement. *See*

Supplemental Brief Opposing Grievance, *In re 500 James Hance Court, L.P. & Knauer & Gorman Constr. Co.*, No. PWAB–8G–2006 (PWAB May 1, 2008), at 19 ("[T]his building would not be built but for the Collegium Charter School.").

After oral argument, and with the stipulation and accompanying documents serving as the factual record, the Board issued its final decision and order on June 30, 2008. The Board determined that the Wage Act applied to the entire project and denied Appellees' grievance. Its factual findings tracked the parties' stipulation, including the misleading assertion that prevailing wages were requested of the Department for the interior construction in August 2006.

In its reasoning, the Board discussed the relevant statutory terms, *see supra* Part I(B); indicated that the Act's purpose is to protect workers on public projects from substandard wages; and observed that the enactment is a remedial statute, as to which exceptions are to be construed narrowly. *See* Final Decision & Order, *In re 500 James Hance Court, L.P. & Knauer & Gorman Constr. Co.*, No. PWAB–8G–2006, *slip op.* at 6 (PWAB June 30, 2008) (citations omitted).[11] Additionally, the Board explained that, under prevailing law, the burden of proof in a grievance proceeding is on the grievant. *See id.* at 7 (citing 34 Pa.Code § 213.8(j)).

The Board proceeded to discuss the *Mosaica* line of cases. From *Mosaica I*, it drew the proposition that charter schools are to be treated the same as traditional public schools for purposes of construction projects, *see Mosaica I*, 836 A.2d at 189, as well as the subsidiary proposition that the Wage Act's

11. *See generally Borough of Youngwood*, 596 Pa. at 618, 947 A.2d at 733 ("[T]he Act's focus is placed squarely on protecting workers on public works projects from receiving substandard wages.... Although ... budgeting concerns of public bodies are highly important, the Act does not provide that its mandate to protect workers on public works projects ... is to be subservient to budgeting matters."); *Keystone Chapter of Associated Builders & Contractors, Inc. v. DLI*, 51 Pa.Cmwlth. 586, 593, 414 A.2d 1129, 1133 (1980) (explaining that the "fundamental purpose of prevailing wage legislation is to protect the workmen employed on a government project from payment of substandard wages—keeping in mind that the lowest responsible bidder is customarily awarded public contracts").

requirements that funds for construction be expended by a "public body" on "public work" were essentially obviated in the context of charter schools by the Charter School Law. *See id.* at 189–90.

As to *Mosaica II,* the Board differed with Appellees' argument that the decision controlled the outcome of their own grievance proceedings. Whereas in *Mosaica II* the Commonwealth Court had found no evidence that the charter school had any role in determining space and performance goals for the project, *see Mosaica II,* 925 A.2d at 187, in the present circumstances the Board emphasized that it was undisputed that the Foundation and/or School controlled one of the two core phases of the project (*i.e.,* the fit-out), and that public monies would be used to pay for the construction in that phase. Accordingly, the Board related, prevailing wages pertained at least to that phase. Furthermore, the Board reasoned, had the project proceeded under one contract, as originally structured, "the combination of work covered by the Act, with other work, would have subjected the entire project to the Act, without any need to determine if the other work independently qualified as public work." Final Decision & Order, No. PWAB–8G–2006, *slip op.* at 10 (citing *Borough of Ebensburg v. PWAB,* 893 A.2d 181 (Pa.Cmwlth.2006)); *see also id.* at 11 ("At argument, [Appellees] commendably conceded that the project was broken up into two contracts to avoid application of the Act, characterizing this as a fair assessment.").

Thus, the Board placed particular emphasis on the timing of the bifurcation of the project, which occurred five months after the property already had been committed to use as a charter school, under the October 1, 2006, pre-development lease. According to the Board, existing Commonwealth Court decisions suggest that "contracts cannot be artificially separated to avoid prevailing wage requirements." *Id.* (citing *Borough of Ebensburg,* 893 A.2d at 186); *accord Veterans Admin. Lease,* 18 U.S. Op. Off. Legal Counsel at 116 (admonishing that an "agency cannot evade the purposes of this country's labor laws by clever drafting").

From this point in its opinion, the Board proceeded to adopt and apply the *Phoenix Field Office* test. Initially, the Board rejected Appellees' position that this test was inconsistent with *Mosaica II* and *Penn. National I.* With regard to the former, the Board observed that the Commonwealth Court merely found that the application of the test to the circumstances before it did not require wage regulation. *See Mosaica II,* 925 A.2d at 187. As to the latter, the Board explained that, of the four-part test to determine the Wage Act's applicability set forth in *Penn. National I,*[12] the only debatable element was whether the work was "paid for in whole or in part with public funds," or with charter school funds under the modified test of *Mosaica I.* Final Decision & Order, No. PWAB–8G–2006, *slip op.* at 13. According to the Board, however, this element does not require strict privity of contract between a covered entity and a construction contractor. *Id.* at 13–14 (citing *Lycoming County Nursing Home Ass'n, Inc. v. DLI,* 156 Pa.Cmwlth. 280, 288, 627 A.2d 238, 242 (1993) (explaining that "[t]he definition for 'public work' does not require that a 'public body' must be directly involved with the project; only that the project must be paid for in whole or in part with public funds")). In this regard, the Board observed that in *Pennsylvania State Building and Construction Trades Council, AFL–CIO v. PWAB,* 570 Pa. 96, 808 A.2d 881 (2002) ("*Penn. National II* "), this Court determined that the Wage Act applied to a project undertaken by a private entity which was subsidized with public funds. *See id.* at 111, 808 A.2d at 890.

Focusing on the pre-development lease scenario, the Board suggested that, as a general proposition, rent payments may be viewed as indirectly paying for construction costs, which

12. As related in *Penn. National I,* the complete set of elements are:
   (1) there must be certain work;
   (2) such work must be under contract;
   (3) such work must be paid for in whole or in part with public funds; and
   (4) the estimated cost of the total project must be in excess of $25,000.
   *Penn. Nat'l I,* 715 A.2d at 1074.

presents what it termed a "thorny problem." Final Decision & Order, No. PWAB–8G–2006, *slip op.* at 14. It stated:

> On one hand, it would be absurd to suggest that construction of a high-rise office building is subject to the Act because one of many prospective tenants happens to be a government agency. On the other hand, a construction contract could be cleverly redrafted as a lease to circumvent the Act's coverage.

*Id.* In resolving this dilemma, the Board agreed with the Bureau that the *Phoenix Field Office* test offers "probably the most comprehensive and cogent [analysis] balancing these concerns." *Id.*

Assessing the *Phoenix Field Office* factors against the present circumstances, the Board ultimately determined that they weighed in favor of requiring prevailing-wage coverage for the shell because: the lease is for twenty-four years with an option to purchase after five years; the lease payments will pay for the shell's construction costs within six years;[13] the building is to be used exclusively for a charter school; 23.7 percent of the total construction costs are for customizing the facility, *i.e.*, for the fit-out; Developer admitted that the project was bifurcated to avoid prevailing wage requirements for the shell; and, although the Bureau made a less-than-compelling argument that the shell would not be generic, the plans and specifications were not included in the Stipulation, a critical omission since Appellees had the burden of proof in the proceeding as a whole under the applicable regulations. *See id.* at 14–20 (citing 34 Pa.Code § 213.8(j) (providing that the grievant has the burden of proof in any evidentiary hearing)).

The Board did not resolve specifically the parties' dispute concerning whether or not Developer would have proceeded with construction absent the pre-development lease with the Foundation. Presumably, it so refrained since the parties had

13. The construction costs referenced by the Board in this context subsume the $5.1 million outlay for physical construction, as well as the costs of servicing that portion of the loan for six years. *See* Promissory Note at ¶ 2, *reproduced in* R.R. 166a (reflecting, *inter alia,* an annual interest rate of 7.25 percent).

not provided a factual record from which an affirmative determination could be made.

A divided panel of the Commonwealth Court reversed in a published opinion. *See 500 James Hance Court v. PWAB*, 983 A.2d 792 (Pa.Cmwlth.2009). The majority opened its legal analysis with a review of *Penn. National I*, where this Court accepted the possibility that the Wage Act's applicability might be limited to a stage or stages of a multi-phase construction project. *See Penn. Nat'l I*, 552 Pa. at 398, 715 A.2d at 1074 ("Nothing in section 5 of the Act mandates that an entire construction project be covered by the Act."). The majority then accepted the bifurcation of the Collegium Charter School project without further critical analysis, based primarily on the conclusion that the building shell was not to be paid for in whole or in part from the funds of a public body. *See 500 James Hance Court*, 983 A.2d at 799. In this respect, the majority criticized the Board for suggesting that the financing of the shell construction was not entirely private, but rather, was secured by the Foundation's rent payments. *See id.* at 800 ("The clear and uncontroverted distinction is that the construction of the 'building shell' was not 'public work' because the project was financed and secured by [Appellees].").[14]

Regarding the Board's position that the bifurcation of the Collegium Charter School project represented an attempt to circumvent the Wage Act, the Commonwealth Court majority focused entirely on its *Mosaica II* decision. In material part, the majority highlighted that the contractual relationship between the charter-school management company and the charter school, in *Mosaica*, did not arise until after the management company had contracted for renovations to the building. *See id.* at 801. The majority considered the circumstances to be the same in the present case, because the contractual relationship between Developer and the Foundation "was con-

14. In fact the Board did not so indicate. Rather, the Board recognized that the shell was privately funded, but it held, nevertheless, that the separation of the shell construction from the publicly funded fit-out was artificial and, under the *Phoenix Field Office* test, the overall project was subject to wage regulation.

cluded" on March 1, 2007, after Developer already had entered into a contractual relationship with Contractor to construct the building. *Id.* (citation and quotation marks omitted).[15] Responding to the Board's determination that the bifurcation had occurred after the parties already were legally committed to the development of a charter school, the majority stated that this finding was incorrect. The majority observed that Developer had entered into an initial construction contract with Contractor in September 2006, several days before the original October 1, 2006, lease between Developer and the Foundation was consummated. *See id.* at 802.[16]

Without discussing the *Phoenix Field Office* test, which lay at the heart of the Board's determination or the associated concern with the potential for public works disguised as lease arrangements to avoid wage regulation, the Commonwealth Court majority pronounced that rent payments simply are not the equivalent of construction funding. It emphasized that the lease reflected Appellees' intent to maintain control over its property and not to sell the property to the Foundation;[17] payment of rent by the Foundation in consideration for use and occupancy; and Appellees' reversionary interest in the property. *See id.* at 803–04. According to the majority, "[t]he Board provided no guidance to this Court, neither by statute nor by case law, to justify its conclusion that the rent was somehow synonymous with or tantamount to payments for the construction of the 'building shell' leased by the Collegium Foundation." *Id.* at 804.[18]

15. The majority's logic on this point is also unsound, since the original "arising" of a contractual relationship and the "conclusion" of such a relationship, in terms of a later amendment, are not congruent events.

16. This observation, of course, is non-responsive to the Board's position that the construction contract was *bifurcated*, in March of 2007, to avoid Wage Act requirements five months after the parties already were legally committed to the development of a charter school building. Moreover, the Commonwealth Court did not account for the fact that the September 2006 construction contract was expressly for the purpose of building the "Collegium Charter School."

17. The majority did not mention the lease's purchase option in this passage of its opinion.

18. While this may be true as stated, certainly the Board provided the Commonwealth Court with decisions favoring close review of pre-

Senior Judge Kelley authored the dissent, finding *Mosaica II* distinguishable. The dissent noted that, in *Mosaica II,* the court held that the act did not apply, not because the contract for constructing a building shell was bifurcated from the contract for a publicly funded fit-out, but because, at the time renovations were conducted, the charter-school management company did not have a contract with any school and no public funds were used for such renovations. *See id.* at 804 (Kelley, S.J., dissenting). Senior Judge Kelley distinguished the present circumstances, as follows:

[T]he entity of 500 James Hance Court, LLC, intended to construct a facility solely for the Collegium Charter School and had a formal relationship with the school. Originally, construction of the building shell and fit out for Collegium Charter School were established under one contract, which was entered into on September 25, 2006 . . . The lease for the charter school was entered on October 1, 2006. The various leases and construction contracts all listed the project as the "Collegium Charter School" before the work was divided in March 2007. This building would not have been built but for the Collegium Charter School occupancy.

*Id.* Further, the dissent observed that exceptions to prevailing wage coverage should be narrowly construed in light of the Act's remedial nature. According to the dissent, such an approach compelled application of wage regulation to the construction of the entire building, including both shell and the fit-out works. *See id.* at 804–05.

The Bureau sought reargument, suggesting that the Commonwealth Court majority merely framed and rejected a series of straw-man arguments while ignoring the central position of the Board and Bureau grounded on the *Phoenix Field Office* test for assessing the role rental payments play in financing a public work. According to the Bureau's petition, the majority opinion "allows circumvention of payment of Pennsylvania prevailing wages through legal and financial

development lease arrangements which thwart operation of prevailing wage laws, including the *Phoenix Field Office* line.

stratagems." Application for Reargument at 1. The Commonwealth Court denied reargument without opinion.

This Court allowed further appeal to address the Board's and Bureau's salient position. *See 500 James Hance Court v. PWAB*, 606 Pa. 502, 999 A.2d 589 (2010) (*per curiam*).

## II.  The Parties' Presentations

### A.  The Primary Briefs

Presently, the Bureau maintains its core position that:  the Collegium Charter School project was "artificially bifurcated" via a belated alteration of a lease designed to evade wage regulation;  the result is to undermine the legislative policy dictating that cost savings on construction projects financed in whole or in part by public funds are not to be achieved at the expense of workers;  the Commonwealth Court inappropriately ignored that there are many avenues, in today's sophisticated business and legal environments, for thwarting the Wage Act's requirements;  careful screening by administrative and judicial tribunals is essential to guard against abuses;  and the *Phoenix Field Office* test is an appropriate litmus to ensure effectuation of the salient legislative objectives.  The Bureau also continues to advance its factual assertion that the building was a directed-purpose project from the outset.  *See, e.g.,* Brief for Intervenor at 14 ("This project was designed to be completed as the Collegium Charter School from the start."). Additionally, the Bureau frames its position on this point in terms of the allocation of the burden of proof to Developer. *See id.* at 15 ("Developer had the burden of proof in this proceeding and failed to point out anything in the record that the project was not a custom-built facility.").

In response, Appellees reiterate their position concerning the propriety of and common instance of bifurcation to accommodate tenant needs;  the concomitant separateness of the public and private financing aspects of the Collegium Charter School project;  and the legitimacy and accouterments of the lease relationship between Developer and the Foundation. From the broadest frame of reference, Appellees' position remains that a private developer assumes and retains substan-

tial risk in undertaking a pre-development lease, which does not attend a conventional construction contract employed in connection with a public work. According to Appellees, this amply distinguishes a lease scenario from the public-work paradigm.

Appellees also place substantial reliance on the following explanation from *Penn. National I:*

Nothing in section 5 of the Act mandates that an entire construction project be covered by the Act. On the contrary, section 5 is a limited requirement that workmen be paid prevailing wage only on "public work." The legislature could have crafted the definition of "public work" to include work that was not paid for in whole or in part with funds of a public body, but instead it chose to limit prevailing wage to be paid only on that work that satisfies the four element definition of "public work."

Brief for Appellees at 10–11 (quoting *Penn. Nat'l I,* 552 Pa. at 398, 715 A.2d at 1074). Appellees maintain that Developer planned to construct a generic commercial building on the premises prior to the Foundation's involvement, albeit they provide no response to the Bureau's observations that this is not a fact of record and that the burden to create a record to support such a contention rested with Appellees.

Appellees' *amicus,* the Keystone Chapter of Associated Builders and Contractors, agrees with Appellees that bifurcation into shell and fit-out is a common business practice and suggests that applying what it terms an "overreaching" interpretation of the Act could have a detrimental effect on development in Pennsylvania and the construction industry, and make developers less likely to offer their space to public users. Brief for *Amicus* Keystone Chapter of Associated Builders & Contractors, Inc. at 3. Appellees' other *amicus,* the Pennsylvania Coalition of Public Charter Schools, maintains that it would be improper to use the multi-factored test developed by a federal agency under the Davis–Bacon Act in the present circumstances, because nothing in the Charter School Law or the Wage Act suggests that the General Assembly intended that such a test be applied with respect to charter schools. It

alleges, as well, that the test is overly subjective and that its practical effect would be to reduce the supply of buildings available for lease to charter schools—thereby thwarting the apparent legislative goal in favor of having charter schools lease their facilities—as well as to significantly increase the costs to charter schools of leasing a facility.

## B. The Supplemental Briefs and Record

Upon our initial review, we found it difficult to address a number of the parties' arguments on the basis of the stipulation they presented, and we directed them to provide correction or clarification per Rule of Appellate Procedure 1926. *See* Order, *500 James Hance Court v. PWAB*, No. 49 MAP 2010 (Pa. Aug. 5, 2011) (*per curiam*). In particular, we were concerned with the absence of lease attachments containing material terms governing the Foundation's and Developer's contractual relationship. We also questioned the accuracy of the indication, in the parties' stipulation, that there was some early request for prevailing wages for the fit-out.[19]

> The implication [of the stipulation] seems to be that the lessee or the lessor (or at the very least someone besides the Bureau) considered interior construction to be subject to the Prevailing Wage Act prior to August 25, 2006, and requested prevailing wage rates in that time period per the Act. This is consistent with various representations made by the appellee[s] throughout the litigation. *See, e.g.*, Brief for Appellants, *500 James Hance Court, L.P. v. PPWAB*, 983 A.2d 792 (Pa.Cmwlth.2008 [2009]), 2008 WL 7276625, at *15 ("[F]rom the outset, there has never been a question whether prevailing wages were mandatory for the fit out performed by the Foundation since public funds were used to complete this portion of the project."). Nevertheless, Bureau correspondence dated October 27, 2006, seems to con-

19. As previously developed, the relevant proviso of the stipulation is as follows:

> Pennsylvania prevailing wages were requested for the construction of the "fit out." The Bureau issued rates for the project on August 25, 2006, Serial Number 06–6040.

Stip. ¶ 16.

tradict such an inference, as the Bureau's deputy chief counsel indicates that "Pennsylvania prevailing wages *were not requested* for this project."

*Id.* at 3 (emphasis in original).

In response, a supplemental record was provided containing some of the exhibits to the leases, including Exhibit E to the October 1, 2006, lease. As previously noted, Exhibit E confirms that the $1.6 million "security deposit" to be provided by the Foundation was allocated largely to funding the procurement of materials necessary to the building fit-out. The parties also supplied documents confirming that the School took the position from the outset that no part of the project was subject to prevailing wage requirements.

The Bureau and Appellees also filed supplemental briefs. The Bureau explained that the stipulation was materially inaccurate in its suggestion of an early request of the Department for prevailing wage rates. In fact, according to the Bureau's supplemental brief, the first actual request for rates (other than the Bureau's own request upon its determination that the Wage Act applied) occurred on May 11, 2007. On this point, Appellees' brief responds to this Court's query as to who—other than the Bureau—requested prevailing wage rates by acknowledging "somewhat of a mistake" in the existing stipulation. Supplemental Brief for Appellees at 4. Unhelpfully, Appellees phrase their remaining explanation, again, in the passive voice, stating: "[P]revailing wage rates for the construction of the 'fit-out' work ... were requested on November 20, 2006." *Id.*[20]

20. Presumably, Appellees mean that the Bureau was the requestor based on its determination that prevailing wages were required. The fact of the Bureau's determination and pursuit of wage regulation, of course, was already plain enough from the existing administrative record. Moreover, Appellees' apparent reference to the Bureau's actions is non-responsive to the Court's inquiry. The Wage Act is clear in its requirement that a public body (or charter school, under the incorporating provision of the Charter School Law) is to contact the Department to determine prevailing wages on any project of public work. *See* 43 P.S. § 165-4. Our request for clarification or correction was plainly directed to determining whether and when this had occurred, in light of the misleading stipulation.

## III. Discussion

■ Appellate review of the Board's decision is limited to determining whether a constitutional violation, an error of law, or a procedural irregularity has occurred, and whether the necessary factual findings are supported by substantial evidence. *See* 2 Pa.C.S. § 704; *Pa. Nat'l I*, 552 Pa. at 391 n. 3, 715 A.2d at 1071 n. 3; *Leonard S. Fiore, Inc. v. PWAB*, 526 Pa. 282, 293, 585 A.2d 994, 1000 (1991). The present case is centered on the correctness of the legal framework employed by the Board to resolve Appellees' grievance and on evidentiary sufficiency.

### A. Streamlining the Issues and Contentions

This appeal is substantially more convoluted than it should be as a result of a very modest factual record omitting important details, such as material terms of the leases; imprecision and/or artfulness in the depiction of the factual circumstances both in the stipulation and in the briefs; repeated extra-record assertions; and a failure, on the part of the Commonwealth Court, to provide a complete and creditable analysis of the Board's rationale and the Bureau's arguments on their terms, *see, e.g., supra* notes 14–18. In this disordered landscape, we offer the following preliminary comments to clarify our own decisional focus.

Initially, there appears to be a fair degree of intermixing of several different, albeit overlapping, questions. First—and the issue of greatest public importance in this appeal—is the question of whether, or under what circumstances, a pre-development lease implicates regulation under the Wage Act. The second question concerns the degree to which parties which have entered into a lease incorporating a public funding

Moreover, the Bureau's fall–of–2006 determination and request for wage rates went to the entire building project, not just the fit-out, but the express subject of our inquiry was directed to the stipulation's misleading suggestion that there had been some specific request for rates directed to the fit-out.

To the degree that there is an implication of coyness in Appellees' overall treatment of both the terms of the initial lease and the request or requests for rates based upon it, such implication has not been removed by Appellees supplemental brief.

component (here, the October 1, 2006, lease's allocation to the procurement of certain construction materials and equipment of the $1.6 million "security deposit" comprised of bond proceeds) may later alter their agreement to eliminate the public funding aspect. The third, interrelated question can be framed in terms of whether such a modification can be accomplished by phasing the development or by bifurcating the construction project into "shell" and "fit-out" stages.

The first of these questions represents our main concern, given its wider significance, and is the subject of our main discussion below. The second, at least in its broadest frame, has not been squarely presented by the Bureau, which is the appellant at this stage of the litigation and therefore bears the responsibility to frame the issues it wishes to be heard. *See, e.g., Commonwealth v. Reed,* 605 Pa. 431, 438, 990 A.2d 1158, 1163 (2010) (referencing the ordinary rule that the appellant bears the obligations of issue preservation and presentation). By way of further explanation, a subtext of this appeal arises out of the questionable behavior of the Foundation and/or Developer in styling the tender of $1.6 million in public funds to be used to finance construction materials as a "security deposit," while failing to request a determination from the Department of prevailing wage rates, and denying any involvement of public (or charter-school) funds when the Bureau opened an investigation. The Bureau, however, has participated in generating a factual presentation in this litigation which downplays the particulars of the October 1, 2006, lease. For example, the stipulation comprising the core factual record in the case simply passes over this lease, omitting it from its chronological sequence in the recitation of the material facts.

Indeed, there seems to be an overall reluctance on the part of all the parties to develop the role of the $1.6 million "security deposit" in these affairs. Furthermore, the Bureau has not offered legal authority to support any sort of estoppel theory, by which Appellees might be considered to be bound to the circumstances prevailing under the initial lease. Thus, consistent with the manner in which the appeal has been

presented to us, we will center our own review on the March 1, 2007, lease amendment.[21]

■■ As to the third question, absent some sort of estoppel, there does not appear to be any reason why parties to a contract or lease cannot modify their relationship to account for legal requirements (such as prevailing wages) which may attach to one, but not another, manner of transacting.[22] Addi-

21. As we read the dissent, it appears to be grounded in part upon an estoppel theory (*i.e.*, because the transaction was originally structured in a way which would implicate wage regulation with respect to shell construction, it must be so understood in spite of any restructuring). *See* Dissenting Opinion, at 274–78, 33 A.3d at 577–79. Like the Bureau, however, the dissent fails to supply any authority supporting estoppel, opting instead to simply characterize the contractual restructuring as "form trump[ing] substance." Dissenting Opinion, at 278, 33 A.3d at 579. We decline, however, in the absence of a developed argument from the Bureau as the appellant, to undertake what would amount to an exercise of judicial power to essentially "freeze" a contractual arrangement in place. Such an exercise would seem to be especially problematic in the present context, since the Bureau did not provide the material terms of the original, executed lease to the Board or the appellate courts or rely upon it in its stipulation of facts or arguments.

22. *Cf. Gregory v. Helvering*, 293 U.S. 465, 468–70, 55 S.Ct. 266, 267–68, 79 L.Ed. 596 (1935) (holding that taxpayers may reorganize corporate structures to reduce their tax liability notwithstanding that their sole motivation is to pay less taxes, so long as the reorganization does not amount to "an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else"). *See generally* William Tetley, *Evasion/Fraude à la Loi and Avoidance of the Law*, 39 McGill L.J. 303, 318 (1994) ("Taking steps so that one law is applicable rather than another can be proper or improper, acceptable or unacceptable, much like tax *avoidance*, which is within the law, and tax *evasion*, which is not." (emphasis in original)).
Our citation to a tax case for the above proposition is perhaps unfortunate, as it has generated a collateral dispute with the dissent based on the fact that strict construction is involved in the tax arena. *See* Dissenting Opinion, at 276–78, 33 A.3d at 578–79. In any event, as we read *Helvering*, it has little to do with strict construction of tax laws (which is not a homogenous proposition internal to the law of taxation in any event, *see, e.g., Lynnebrook & Woodbrook Assocs., L.P. v. Borough of Millersville*, 600 Pa. 108, 115, 963 A.2d 1261, 1265 (2008)). Rather, it merely reflects that the written specifications and limitations inherent in any statutory or regulatory framework will define its scope. *See generally Ratzlaf v. United States*, 510 U.S. 135, 145, 114 S.Ct. 655, 661, 126 L.Ed.2d 615 (1994) ("Courts have noted many occasions on which persons, without violating any law, may structure transactions in order to avoid the impact of some regulation or tax." (internal quotation marks and citation omitted)). In the case of the Act, it simply does not

tionally, we agree with Appellees that there can be as strong and logical a demarcation between shell and fit-out work relative to commercial premises as there is between site preparation and ensuing structural construction. There is no dispute that interior construction in commercial premises is often tailored to the specific needs and interests of the occupant, and, thus, that the lessee may desire greater participation and supervision over fit-out construction. Therefore, we reject the Bureau's position that the latitude accorded in *Penn. National I* to legitimately phased construction does not apply to the demarcation between shell and fit-out construction of commercial premises. *See Penn. Nat'l I*, 552 Pa. at 398, 715 A.2d at 1074 ("Nothing in section 5 of the Act mandates that an entire construction project be covered by the Act."); *accord City of Long Beach v. Dep't of Indus. Relations*, 34 Cal.4th 942, 22 Cal.Rptr.3d 518, 102 P.3d 904 (2004) (finding that prevailing wages were not required for the construction of a building even though public money was used to pay professionals involved in pre-construction activities, such as architects, project managers, lawyers, and surveyors).[23] Although *Penn. National I* should not be read to

compel private parties who undertake construction projects to do so with public funding, and this limitation exists regardless of the Act's status as remedial legislation or the societal goals it seeks to achieve. *Cf.* 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.").

It is significant, moreover, to understand that this is not a situation where a party entered into a construction contract for a public work, then, after a Bureau determination that prevailing wages applied, attempted to recast such a contract as a pre-development lease. Rather, the present scenario always involved a lease relationship, albeit with the original, questionable injection of a public funding component via the "security deposit" term of the October 1, 2006, lease. This perspective removes some force from the suggestion that the lease amendment perpetrated a subterfuge. Rather, if anything, it appears that the amendment served to remove a potential subterfuge (*i.e.*, the $1.6 million "security deposit"/financing term).

23. In *Borough of Ebensburg v. PWAB*, 893 A.2d 181 (Pa.Cmwlth.2006), a municipality undertook sidewalk and curb replacement, where the cost of the sidewalk portion of the project was ultimately assessed to the adjacent property owners. The court held that the entire project was funded, at least in part, by a public body. Although the parties

authorize artificial construction phasing bearing no indepen-dent business justification, its rationale by its terms extends to major, commonly-appreciated construction milestones, such as the completion of site preparation or of a commercial build-ing's shell. In this regard, it appears undisputed that bifurca-tion of an office building into a shell and its fit-out is an industry practice which may allow for the creation of a generic exterior, with prospective tenants retaining the ability to tailor the interior for their needs. *See Columbia–Pac. Bldg. & Constr. Trades Council, AFL–CIO v. Oregon Comm'n on Pub. Broad.*, 102 Or.App. 212, 794 P.2d 438, 442 (1990) (observing that the building at issue "is in major part a general office building," and that the interior "is convertible for use by other lessees, if [the public tenant] does not purchase the building or terminates the lease early"), *superseded by statute as stated in Portland Dev. Comm'n v. State ex rel. Bureau of Labor & Indus.*, 216 Or.App. 72, 171 P.3d 1012, 1015–16 (2007).

We agree with the Bureau, however, that *Penn. National I*'s holding does not answer all questions arising in pre-development lease scenarios, as such setting presents its own unique concerns in the application of the Wage Act. Thus, our main focus, going forward, is on whether the *Phoenix Field Office* test, or some other appropriate litmus, should pertain to screen against artful drafting of contracts to evade wage regulation.

## B. Pre–Development Lease Scenarios

In terms of the Wage Act, the pre-development lease sce-nario most closely implicates the element entailing payment, in whole or in part, with public funds, *see* 43 P.S. § 165–2 (definition of "public work"), or, under *Mosaica I*, charter school funds. *See Mosaica I*, 836 A.2d at 189–90. Facially, the present record establishes, consistent with the March 1, 2007, amended lease, that the building-shell construction

reference *Ebensburg,* it is of little help presently because the municipali-ty did not attempt to bifurcate the contract or the work. *See id.* at 183, 186.

phase of the Collegium Charter School project is privately funded.

■ Nevertheless, we agree with the Bureau that the labels appended to transactional documents do not exclusively determine the applicability of regulation under the Wage Act, as the potential for evasion and artifice is too great. Rather, as in other settings, the economic reality of the transaction should control. *Cf. Frank Lyon Co. v. United States,* 435 U.S. 561, 573, 98 S.Ct. 1291, 1298, 55 L.Ed.2d 550 (1978) (explaining, in the context of federal tax regulation, that "[t]he Court has never regarded 'the simple expedient of drawing up papers' as controlling ... when the objective economic realities are to the contrary." (citation omitted)). Thus, the question legitimately arises whether the stream of rental payments required under the Foundation/Developer lease arrangement are tantamount to construction financing.

The *Phoenix Field Office* test provides one method for considering the economic reality associated with a pre-development lease. Most of the prongs of the test, however—*i.e.,* lease length; government involvement; private versus public use; recapture of construction costs; and evasive drafting, *see Phoenix Field Office, Bureau of Land Mgmt.,* ARB Case No. 01–010, *slip op.* at 8–11—offer only very generalized guidance. The last factor (evasive drafting) is the only one which would seem to bear substantial independent significance if proven. Given the unlikelihood that evasiveness will be conceded, however, in most cases the proofs must circle back to a consideration of the overall circumstances.

■ In view of the looseness inherent in the framing of the *Phoenix Field Office* factors, we do not believe it would be useful for us to adopt them here. We realize that the Board felt differently, and we acknowledge the substantial deference generally afforded to the interpretation of an enactment rendered by the agency charged with its administration. *See Rendell v. Pa. State Ethics Comm'n,* 603 Pa. 292, 306, 983 A.2d 708, 716 (2009). Nevertheless, we need not defer uncritically, particularly if we find that the interpretation is impru-

dent or inconsistent with legislative intent. *See Pa. Human Relations Comm'n v. Uniontown Area Sch. Dist.*, 455 Pa. 52, 77–78, 313 A.2d 156, 169 (1973) (plurality).

In particular, we do not believe that the prongs of the *Phoenix Field Office* test account sufficiently for a key aspect of business transactions, namely, the allocation of risk. Notably, in assessing the economic realities of a particular lease transaction (albeit for purposes of federal income taxation), the United States Supreme Court placed particular emphasis on the risk undertaken by the lessor. The Court explained as follows:

> Here, . . . most significantly, it was [the lessor] alone, and not [the lessee], who was liable on the notes. . . . Despite the facts that [the lessee] had agreed to pay rent and that this rent equaled the amounts due from [the lessor] to [the secured creditor], should anything go awry in the later years of the lease, [the lessor] was primarily liable. No matter how the transaction could have been devised otherwise, it remains a fact that as the agreements were placed in final form, the obligation on the notes fell squarely on [the lessor]. [The lessor], an ongoing enterprise, exposed its very business well-being to this real and substantial risk. The effect of this liability on [the lessor] is not just the abstract possibility that something will go wrong and that [the lessee] will not be able to make its payments. [The lessor] had disclosed this liability on its balance sheet for all the world to see. Its financial position was affected substantially by the presence of this long-term debt, despite the offsetting presence of the building as an asset. To the extent that [the lessor] had used its capital in this transaction, it is less able to obtain financing for other business needs.

*Lyon*, 435 U.S. at 576–77, 98 S.Ct. at 1300 (footnotes omitted).

■ We agree with the United States Supreme Court (and Appellees) that risk allocation should be a prominent consideration in assessing the economic reality of a business transaction and, in particular, a lease, and that such analysis appro-

priately extends to the Wage Act setting. While recognizing that the Act is remedial in nature and appreciating the need to contain exceptions, privately financed construction work does not facially implicate the terms of the Act. Therefore, a grievant which presents evidence that it is incurring the risk and obligations of an owner/mortgagor in construction, that there is no public-financing component in the work (or, under, *Penn. National I,* in the relevant major phase of construction), and that its relationship with the covered entity is as a lessor under a facially legitimate lease, has established a *prima facie* case that wage regulation is not implicated under the prevailing statute.[24] At such point, we find it appropriate to allocate the burden to the Bureau to go forward with the evidence to establish that the economic reality of the transaction is different from its appearance.[25] Where the Bureau does so sufficiently, the ultimate burden should rest with the grievant. *See Henes,* 317 Pa. at 310, 176 A. at 506; *accord* 31A C.J.S. *Evidence* § 199.

Presently, we will not attempt to hypothesize the range of circumstances which might counterbalance a *prima facie* case in the pre-development lease setting. Rather, we believe it is enough to conclude that the Bureau has not gone forward with the evidence to a sufficient degree such that the ultimate burden should shift back to Appellees.

For example, there is little indication that the lease payments by the Foundation were designed to be anything other than compensation for use of the building. To support its contrary finding, the Bureau highlights that, at oral argument, Appellees indicated that the lease payments would allow con-

24. The General Assembly, of course, is free to modify the Act (within the limits of the Constitution) to extend it to construction activities within the contemplation of a pre-development lease involving a covered party. As noted, however, the plain language of the existing statute does not do so.

25. The rational derivation of such allocation of the evidentiary burden was developed, in Pennsylvania, long ago in *Henes v. McGovern,* 317 Pa. 302, 310-11, 176 A. 503, 506 (1935); *accord* 31A C.J.S. *Evidence* § 199 (2011); *cf. In re Pillowtex, Inc.,* 349 F.3d 711, 716 & n. 6 (3d Cir.2003) (allocating the burden of proof to the party claiming that what purports to be a lease is actually not).

struction costs to be recouped in six years. *See* Final Decision & Order, *In re 500 James Hance Court, L.P. & Knauer & Gorman Constr. Co.*, No. PWAB–8G–2006, *slip op.* at 14–15. However, it is evident that few office buildings would be built if the construction costs, including the cost of servicing the construction loan, could not ultimately be recouped by anticipated lease payments within a reasonable time frame. Even to the degree this factor focuses on the prospect that the Foundation's lease payments will, alone, allow for such recoupment, such a circumstance remains of little probative value relative to the question of whether the lease is a disguised construction contract, absent proofs regarding whether a six-year recoupment period is substantially shorter than the industry norm for building shells of the type involved here. *Cf.* 13 Pa.C.S. § 1203(c) (listing factors that do *not* form a sufficient basis to conclude that a lease creates a security interest in goods, including that the present value of the anticipated stream of rent payments exceeds the value of the goods). In this particular respect, we regard the Commonwealth Court's assessment as an accurate one:

> The record fails to establish that the rent payments were the equivalent of funding for the construction of the "building shell." A review of the lease between [Developer] and the ... Foundation supports [Developer]'s position that it intended to maintain control over its property for a leased term of years and not to sell the property to the ... Foundation. The rent paid by the ... Foundation was in consideration for the use and occupancy of the land or building. [Developer] at all times retained a reversionary interest in the property under the lease as the landlord....

*500 James Hance Court*, 983 A.2d at 803–04 (footnotes and citation omitted).[26]

26. The Bureau also does not dispute the Commonwealth Court's findings that: the bank loan obtained by Developer is secured by a mortgage on the property; Appellees are solely responsible for the repayment of the loan; and there is nothing in the record tending to indicate that the note is secured by the Foundation's rent payments. *See 500 James Hance Court*, 983 A.2d at 799–800 (citing Promissory Note, *reproduced in* R.R. 166a–173a). *See generally In re Collegium Found.,*

Likewise, the Bureau has emphasized that the School would be the sole tenant. *See* Final Decision & Order, *In re 500 James Hance Court, L.P. & Knauer & Gorman Constr. Co.,* No. PWAB–8G–2006, *slip op.* at 18. Without more pertinent information, this facet of the arrangement is, again, of little probative impact since it may simply follow from the size of the building and the School's needs. While highlighting the significance of the School's sole tenancy, moreover, the Bureau has not accorded any weight to the fact that the premises would revert to Developer at the end of the lease period. *Accord id.* at 18 n. 14. Absent a finding—or even an allegation—that the building's useful life is likely to be no greater than the 24–year lease term, we find this reasoning counterintuitive because such reversion facially supports Appellees' position that the lease is a *bona fide* one and not a construction contract.

The Bureau and Board have supported their position, moreover, by reference to the Foundation's option to purchase the shell after five years. *See id.* at 14–15. In this respect, they appear to overlook that the price would not be nominal, but rather, would be based on the shell's market value at the time of purchase. *See* Amended Lease at § 3(b), *reproduced in* R.R. 516a (setting the option price as the appraised value of the property minus the cost that the Foundation incurred in constructing the fit-out). Thus, even if the Foundation exercises its option, its lease payments will have already nearly paid for the cost of constructing the shell, including financing costs, and the sum of its lease payments and the purchase price will be nearly twice the construction costs. It is therefore difficult to argue that the five-year purchase option supports the concept that the underlying arrangement is really a contract for construction, and that the Foundation was merely trying to save money by avoiding the need to pay prevailing wages on the shell. *See generally In re Buehne Farms, Inc.,* 321 B.R. 239, 245 (Bankr.S.D.Ill.2005) ("[I]f only

991 A.2d 990, 995 (Pa.Cmwlth.) (denying tax-exempt status to the property at 500 James Hance Court because Developer, rather than the Foundation, is seized of legal and equitable title), *appeal denied,* 608 Pa. 671, 13 A.3d 481 (2010) (*per curiam* ).

a fool would fail to exercise the option, the option price is considered nominal and the transaction revealed to be a disguised sale.").[27]

The Bureau and the Board additionally have failed to account sufficiently for various other aspects of the lease that seem inconsistent with its being a disguised build-to-suit contract. For example, once the fit-out is complete, the Foundation is not permitted to make any further alterations to the premises without the prior written consent of Developer. *See* Amended Lease at § 15, *reproduced in* R.R. 521a. Additionally, the Foundation must allow Developer to make routine, periodic inspections of the premises during business hours and during any emergency. *See id.* at § 25(d), *reproduced in* R.R. 525a.

Finally, the Board's reasoning failed to give effect to the ordinary proposition in civil litigation that at some point a party bearing the burden of proof will have adduced sufficient evidence such that, in the absence of something else from the opposing party, he should prevail. *See supra* note 25. Long ago, this Court adopted the following perspective on the point:

> In every lawsuit, somebody must go on with it; the plaintiff is the first to begin, and if he does nothing he fails. If he makes a prima facie case, and nothing is done by the other side to answer it, the defendant fails. The test, therefore, as to the burden of proof is simply to consider which party would be successful if no evidence at all was given, or if no more evidence was given than is given at this particular point of the case; because it is obvious that during the controversy in the litigation there are points at which the onus of proof shifts, and at which the tribunal must say, if the case stopped there, that it must be decided a particular way. . . . Now that being so, the question as to onus of proof is only a rule for deciding on whom the obligation rests of going further, if he wishes to win.

27. Although offering the above colloquial perspective, the *Buehne Farms* decision, among many others, discusses a number of conventional methods for analyzing whether a purchase option may be considered nominal. Significantly, the Bureau has not provided any concrete and developed analysis of this kind in its brief.

*Henes,* 317 Pa. at 310–11, 176 A. 503, 506 (1935); *accord* 31A C.J.S. Evidence § 199 ("When the party bearing the burden of proof establishes a prima facie case, the adversary has the burden of going forward, that is, offering evidence to contradict the prima facie case[.]"); *cf. Cannon v. Cannon,* 384 Md. 537, 865 A.2d 563, 573 (2005) (reciting that, when a party seeking to enforce a contract generates a *prima facie* case that the contract is valid, the defending party—the one seeking to invalidate the contract—bears the burden of production as to the defenses of fraud, duress, coercion, mistake, undue influence, or incompetence). The approach is grounded in elemental logic and fairness. Indeed, rarely, if ever, does our legal system impose a burden upon one party to parry a potentially limitless series of accusations of wrongdoing by repeatedly proving the negative. Rather, as explained above, when one party makes out a *prima facie* case in its favor (as Appellees did here by proffering the lease), it is generally incumbent upon the opposing party to undermine that case in some way.[28]

28.  Notably, a pure common law approach would more sharply allocate the actual burden *of proof* to the party asserting the affirmative of a particular issue; indeed, portions of the Pennsylvania Code expressly import this approach, *see, e.g.,* 25 Pa.Code § 1021.122 (governing proceedings before the Environmental Hearing Board and mandating that "the burden of proof shall be the same as at common law in that the burden shall normally rest with the party asserting the affirmative of an issue"), which is also reflected implicitly in other aspects of the Code. *See, e.g.,* 204 Pa.Code § 91.79. This general proposition, that the proponent of a rule bears the burden of supporting it, obtains in other jurisdictions as well. It is made express in the federal system through the Administrative Procedures Act, *see* 5 U.S.C. § 556(d) ("Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof."); *Kea v. Police & Firemen's Ret. & Relief Bd.,* 429 A.2d 174, 175 (D.C.1981) (same), and it emerges from the cases. *See, e.g., Phila. Co. v. SEC,* 175 F.2d 808, 818 (D.C.Cir.1949) (stating as a general precept that "the burden of proof lies upon him who affirms, not him who denies"); *Estrin v. Moss,* 221 Tenn. 657, 430 S.W.2d 345, 354 (Tenn.1968) ("As in court proceedings the burden of proof, apart from statute, is on the party asserting the affirmative of an issue before an administrative tribunal."). *See generally Pan Am. Petroleum Corp. v. Wyo. Oil & Gas Conservation Comm'n,* 446 P.2d 550, 556 (Wyo.1968) (recognizing that "burden of proof" is "used in a dual sense and may mean the burden of establishing the case as a whole or the burden on a party to make out a prima facie case in his favor at a certain stage

## C. Summary

In summary, we conclude that the Board's determination that the lease is, in reality, a disguised construction contract for the building as a whole, is based on legal error and essential findings which lack substantial evidentiary support. Facially, the project is rationally divisible according to major phases of shell and fit-out construction. As to the shell, Appellees established the private character of the funding. Furthermore, in terms of economic reality, Appellees presented a *prima facie* case that Developer's only relationship with the Foundation and School was per a *bona fide* pre-development lease. The Bureau failed to go forward with sufficient evidence to the contrary to overcome this *prima facie* case.

In the above assessments, we have not lost sight of the questionable aspects of the lease transaction, particularly in relation to the original "security-deposit"—based financing arrangement pertaining to the interior construction. As to such feature of this litigation, we merely note that the limited role in our analysis is on account of the factual and legal presentation by the litigants.

For the above reasons, the order of the Commonwealth Court is affirmed.

Chief Justice CASTILLE, Justices EAKIN, TODD and ORIE MELVIN join the opinion.

Justice BAER files a dissenting opinion, in which Justice McCAFFERY joins.

Justice BAER, dissenting.

I commend the Majority Opinion for its thorough recitation of the history of this case, especially considering the confusing state of the record and the admittedly "questionable aspects of the lease transaction." Maj. Op. at 274, 33 A.3d at 577. Respectfully, however, I must dissent from its determination that the Prevailing Wage Act does not apply to the construc-

during the hearing"). Our recognition that the Bureau bore a mere burden of production is modest, by way of comparison.

tion of the shell of the charter school building, given the well-established remedial purpose of the Prevailing Wage Act, Act of August 15, 1961, P.L. 987 (as amended 43 P.S. §§ 165–1 to 165–17). *See Pennsylvania Nat. Mut. Cas. Ins. Co. v. PWAB.*, 552 Pa. 385, 715 A.2d 1068, 1072 (1998) ("[T]he primary underlying policy of the [Prevailing Wage Act] is to protect workmen employed on public work projects from substandard pay by ensuring that they receive prevailing minimum wage.") (*"Penn. National I "*).

As noted by the Majority, the Prevailing Wage Act requires that "[n]ot less than the prevailing minimum wages as determined hereunder shall be paid to all workmen employed on public work." 43 P.S. § 165–5. This Court has considered the statutory definition of "public work" in 43 P.S. § 165–2(5) and concluded that the following four requirements must be met before a project will constitute public work triggering the Prevailing Wage Act:

(1) there must be certain work;

(2) such work must be under contract;

(3) such work must be paid for in whole or in part with public funds; and

(4) the estimated cost of the total project must be in excess of $25,000.

*Penn. National I*, 715 A.2d at 1074. In this case, all agree that the construction project involved is certain, under contract, and in excess of $25,000. The dispute concerns whether the project is "paid for in whole or in part with public funds." *Id.*

In regard to "public funds," although charter schools are not public bodies utilizing public funds in the traditional sense, it is uncontested that any funds paid by a charter school for construction would be governed by the Prevailing Wage Act because the Charter School Law mandates compliance with the Prevailing Wage Act. 24 P.S. § 17–1715–A(10)(iii) ("Boards of trustees and contractors of charter schools shall be subject to the following statutory requirements governing construction projects and construction-related work: . . . (iii) The act of

August 15, 1961 (P.L. 987, No. 442), known as the 'Pennsylvania Prevailing Wage Act.'" (footnote omitted)). Indeed, as noted by the Majority, the Commonwealth Court has held that the relevant subsection of the Charter School Law "clearly obviates the requirement that the funds for construction connected with charter schools be spent by a 'public body' on a 'public work'; however, we see nothing in that Section, or elsewhere in the Charter School Law, that would obviate any other prerequisite (such as the requirement that expenditures for construction total more than $25,000)." *Mosaica Educ. Inc. v. PWAB,* 836 A.2d 185, 189–190 (Pa.Cmwlth.2003).

Although the Appellees/Grievants [1] in this case initially contended that no part of the construction project was subject to the Prevailing Wage Act, all parties now agree that the funds paid by the charter school for the interior "fit-out" trigger the application of the Act. The dispute thus involves whether the construction of the shell of the building should also be deemed a public work based upon whether it will be "paid for in whole or in part" by the charter school. *Penn. National I,* 715 A.2d at 1074. I find it unquestionable that had the lease not been amended to separate the funding of the shell from that of the fit-out, the entire project would have been subject to the Prevailing Wage Act because the entire project would have been "paid ... in part" by the charter school. *Id.* As found by the Pennsylvania Prevailing Wage Appeals Board ("the Board"), the Appellees/Grievants admitted that the restructuring of the contracts was intended to avoid the application of the Prevailing Wage Act. Final Decision and Order, June 30, 2008, at 19.

Nonetheless, the Majority Opinion asserts that "there does not appear to be any reason why parties to a contract or lease cannot modify their relationship to account for legal requirements (such as prevailing wages) which may attach to one, but not another, means of transacting." Maj. Op. at 264, 33 A.3d at 570. In support, the Majority relies upon precedent involv-

1. Appellees/Grievants in this case are the developer of the property, 500 James Hance Court, L.P., and the contractor, Knauer and Gorman Construction Co., Inc.

ing tax avoidance. *Id.* at 264 n. 21, 33 A.3d at 571 n. 21. Respectfully, I conclude that the tax avoidance precedent is inapt. Our Rules of Statutory Construction classify statutes imposing taxes as one of the few categories that must be strictly construed against taxation by courts. 1 Pa.C.S. § 1928(b). This strict construction against the imposition of taxes is entirely consistent with our established national view of taxes. Indeed, the United States Supreme Court noted with approval Learned Hand's accurate observation:

"[A] transaction, otherwise within an exception of the tax law, does not lose its immunity, because it is actuated by a desire to avoid, or, if one choose, to evade, taxation. Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes. Therefore, if what was done here, was what was intended by [the statute], it is of no consequence that it was all an elaborate scheme to get rid of [estate] taxes, as it certainly was."

*United States v. Carlton,* 512 U.S. 26, 35–36, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994) (quoting *Helvering v. Gregory,* 69 F.2d 809, 810 (2d Cir.1934)).

The Prevailing Wage Act, however, is not a statute imposing taxation which is to be strictly construed. Instead, it is a remedial statute subject to an opposite rule of statutory construction. It is to be liberally construed to effectuate its objective to protect workers' rights to adequate pay when engaged in public work projects. 1 Pa.C.S. § 1925(c). Previously, this Court expounded upon the remedial nature of this Act:

As previously stated, this Court has already ascertained the clear intent of the Act: "[T]he primary underlying policy of the Act is to protect work[ers] employed on public work projects from [receiving] substandard pay by ensuring that they receive prevailing minimum wage[s]." [*Penn. National I* ], 715 A.2d at 1072. Indeed, the Act imposes **a duty** upon every public body (43 P.S. § 165–4), every contractor and subcontractor performing public work (43 P.S. § 165–6),

and the Secretary of Labor and Industry (43 P.S. § 165–7) to implement by different means the specific mandate of the Act that "[n]ot less than the prevailing minimum wages as determined hereunder shall be paid to all work[ers] employed on public work." 43 P.S. § 165–5. There could be no clearer mandate from the General Assembly that for all public works projects under contract exceeding $25,000, prevailing wages are to be paid to the workers on those projects....

*Borough of Youngwood v. PWAB*, 596 Pa. 603, 947 A.2d 724, 730–731 (2008) (emphasis in original). Accordingly, I respectfully reject that the tax case relied upon by the Majority is appropriate precedent to guide the decision herein. Contrarily, under well-established statutory policy, it is improper to permit form to trump substance and allow parties to structure a transaction to avoid the Prevailing Wage Act, as Appellees/Grievants acknowledged they did.

Even assuming *arguendo* that such transactions are allowable in theory, I must also dissent from my colleagues' method for determining which leases, including those intentionally structured to avoid the Prevailing Wage Act, are not subject to the Act. In creating its test, the Majority rejects the test utilized by the Board and instead looks to the risks allocated to the owner/mortgagor as a "prominent consideration in assessing the economic reality of a business transaction." Maj. Op. at 268, 33 A.3d at 573. The Majority describes its analysis as follows:

> Therefore, a grievant which presents evidence that it is incurring the risk and obligations of an owner/mortgagor in construction, that there is no public-financing component in the work (or, under, *Penn. National I,* in the relevant major phase of construction), and that its relationship with the covered entity is as a lessor under a facially legitimate lease, has established a *prima facie* case that wage regulation is not implicated under the prevailing statute. At such point, we find it appropriate to allocate the burden to the Bureau to go forward with the evidence to establish that the economic reality of the transaction is different from its appear-

ance. Where the Bureau does so sufficiently, the ultimate burden should rest with the grievant.

*Id.* at 267–70, 33 A.3d at 573–74 (internal footnotes omitted). Interestingly, the Majority does not cite any prevailing wage precedent involving consideration of risk allocation.[2]

Rather than utilizing the Majority's test relying upon risk allocation and a "facially legitimate lease," I would adopt the multi-factor *Phoenix Field Office* Test[3] utilized by the Board to determine whether a long-term lease is in reality a construction contract for a public work in disguise. I view this test, detailed below, as appropriately looking to the totality of the circumstances surrounding the lease, with an eye to considering whether the transaction is an attempt to avoid the remedial purpose of the Prevailing Wage Act. Accordingly, I see no reason not to afford the Board's adoption of the *Phoenix Field Office* Test the substantial deference generally accorded to agencies in areas under their expertise. *See Penn. National I,* 715 A.2d at 1073 n. 8 ("[J]udicial deference is to be given to interpretations of statutes by those charged with the administration and enforcement of such laws").

The factors of the *Phoenix Field Office* Test set forth in the Board's decision are (1) the length of the lease; (2) the extent of government involvement in the construction project, such as whether the building is being built to government specifications and whether the government has the right to inspect the progress of the work; (3) the extent to which construction will be used for private rather than public purposes; (4) the extent to which the costs of construction will be fully paid for by the lease payments; and (5) whether the contract is written as a

2. I note that risk allocation was raised by a party in *Pennsylvania State Building and Construction Trades Council, AFL–CIO v. PWAB,* 570 Pa. 96, 808 A.2d 881, 887 (2002) (*"Penn. National II "*), and mentioned by the dissenting opinion in that case, *id.* at 892 (Saylor, J., dissenting), but not utilized by the majority in that decision.

3. As noted by the Majority, the *Phoenix Field Office* Test was employed by the United States Labor Department's Administrative Review Board to determine if a lease was a contract for public work subject to the federal prevailing wage regulation in *In re Phoenix Field Office, Bureau of Land Mgmt.,* ARB Case No. 01–010, 2001 WL 944696 (June 29, 2001).

lease to evade the requirements of the Prevailing Wage Act. Final Decision and Order, June 30, 2008, at 12–13.

Applying the *Phoenix Field Office* Test to the facts of this case, the Board concluded that the factors weighed in favor of application of the Prevailing Wage Act. In regard to the length of the lease, the Board observed that the lease was for a period of almost twenty-four years, with an option granted to the charter school to purchase the real property after five years, which weighed in favor of the application of the Act as "long-term leases of custom built facilities are a common technique used by enterprises (including governments) to acquire new buildings." *Id.* at 14. Turning to the second factor concerning the extent of government involvement in the construction project, the Board opined that the evidence presented did not favor either position clearly, but noted that the burden of proof was on the Appellees/Grievants to demonstrate that the project was not a custom built facility. *Id.* at 15–17 (citing 34 Pa.Code § 213.8(j)).

As to the third factor, the Board considered the extent to which the construction would be used for private rather than public use. It observed that the charter school would be the sole tenant, which favored the conclusion that the building is for public rather than private use. *Id.* at 18. The Board noted that the fourth factor also weighed in favor of application of the Act because the lease payments would pay off the costs of construction within a mere six years, while the useful life of the building was at least the twenty-four year length of the lease. *Id.* at 19. Finally, the Board found that the Appellees/Grievants "conceded at argument that it was a fair assessment that the contract was split into separate contracts to avoid application of the Act, or more accurately to minimize the Act's application to the 'fit-out' or custom work." *Id.* at 19. The Board found this to constitute evidence of an intent to evade the requirements of the Act for purposes of the fifth factor. *Id.* at 20.

Accordingly, after considering all five factors, the Board concluded that the Prevailing Wage Act applied to the construction of the shell of the charter school building. Given the

remedial purpose of the Prevailing Wage Act and the deference that should be given to the determination of the Board, I would affirm the Board's assessment that the construction project was subject to the Prevailing Wage Act.

Justice McCAFFERY joins this opinion.