IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| PSP NE, LLC | : | No. 38 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court dated March |
| | : | 30, 2023 at No. 576 CD 2022 |
| | : | Reversing the Order of the |
| PENNSYLVANIA PREVAILING WAGE | : | Pennsylvania Prevailing Wage |
| APPEALS BOARD | : | Appeals Board dated May 17, 2022 |
| | : | at No. PWAB-1G-2020. |
| | : | |
| APPEAL OF: BUREAU OF LABOR LAW | : | ARGUED: April 8, 2025 |
| COMPLIANCE | : | |

## OPINION

**JUSTICE McCAFFERY**                    **DECIDED: May 19, 2026**

Pennsylvania is one of 32 states that have a "Little Davis-Bacon Act."[1] These acts set a minimum wage for workers on government-funded construction projects. Pennsylvania's version, enacted relatively late in 1961, is known as the Prevailing Wage Act (PWA), 43 P.S. §§ 165-1 – 165-17, and is strikingly concise in its command: "Not less than the prevailing minimum wages as determined hereunder shall be paid to all work[ers] employed on public work." 43 P.S. § 165-5.

---

[1] President Herbert Hoover signed the Davis-Bacon Act, 40 U.S.C. §§ 3141-3148, into law in 1931. The Davis-Bacon Act requires that all construction workers on a government project be paid the typical wages for the relevant geographical area. *See* 40 U.S.C. § 3142(b). Prevailing wage acts enacted by various states are often referred to as "Little Davis-Bacon Acts." *See* John T. Kupchinsky, *The Role of Pennsylvania's Commonwealth Court in the History of the State's Prevailing Wage Law*, 21 WIDENER L.J. 105, 105 (2011).

In this appeal, we are asked to determine whether a build-to-suit lease for the benefit of the Pennsylvania State Police (the State Police) constitutes "public work" for the purposes of the PWA.[2]  "Public work means construction, reconstruction, demolition, alteration and/or repair work other than maintenance work, done under contract and paid for in whole or in part out of the funds of a public body[.]"  43 P.S. § 165-2(5) (emphasis and internal quotation marks omitted).  Our prior precedent refused to adopt the *Phoenix Field Office* test, *see 500 James Hance Court v. Pa. Prevailing Wage Appeals Bd.*, 33 A.3d 555, 572 (Pa. 2011) ("In view of the looseness inherent in the framing of the *Phoenix Field Office* factors, we do not believe it would be useful for us to adopt [the factors] here."), and instead required that "risk allocation should be a prominent consideration" in assessing whether a pre-development lease is subject to the dictates of the PWA.  *Id.* at 573.  Today, we recognize that the explicit text of the PWA requires a consideration of all relevant circumstances to determine whether a pre-development lease is a *bona fide* lease.  Here, the circumstances clearly indicate that public funds paid for, at least in part, construction.  We therefore reverse.

## I.       FACTUAL AND PROCEDURAL HISTORY

The factual background of this appeal is supplied through stipulation in lieu of a hearing before the Prevailing Wage Appeals Board (PWAB).  In mid-June 2018, the State Police generated a 128-page document providing detailed specifications for a new headquarters, barracks, and training facility to be built and located in northeast Pennsylvania.  A little over one year later, the Commonwealth (through the Pennsylvania

---

[2] The parties stipulated the State Police, as a Commonwealth agency, is a public body. *See* Stipulated Facts, R.R. 29a.

State Police) entered into a lease agreement (Lease or Lease Agreement) with PSP NE, LLC ("Developer").[3]

### A. Relevant lease terms

The Lease required Developer to "construct building facilities for exclusive use by the State Police on land and in building facilities owned by" Developer. Stipulated Facts, R.R. 29a. As such, the Lease is a "build to suit lease arrangement" between Developer and the State Police, requiring Developer "to construct the building facilities within a specific enumerated timeline." *Id*. (internal quotation mark omitted) The State Police agreed to pay rent to Developer "for the use and occupancy of the Premises." Lease, R.R. 37a.

The initial term of the lease is 20 years, with two five-year optional extensions. *See* Stipulated Facts, R.R. 29a; Lease Cover Sheet, R.R. 31a. According to the Lease, the State Police may not cancel the contract before 10 years in the absence of exceptional circumstances.[4] After 10 years, the State Police may cancel the contract at its discretion but must pay two penalties. *See* Lease, R.R. 38a. First, a penalty of three months' rent. *See id*. Second, a penalty in the form of reimbursing the Developer for its "unamortized costs of renovations[.]" *Id*.

The total development cost for the project is $17,158,680, of which the Developer borrowed $15,615,940, referred to as "amortized costs" in the Lease Agreement, from

---

[3] Despite the name, Developer "is a privately owned entity, organized in the Commonwealth of [Pennsylvania], which operates as a private real estate developer and landlord." Stipulated Facts, R.R. 29a.

[4] "[I]f the governmental function for which the Premises are being leased[] is abolished, limited, or restricted[] by any Act of Legislature, including a failure of sufficient appropriation by the General Assembly to continue payment of the Rent or any other amount hereunder, or by Law of Congress, or by any legal action taken under authority conferred by such acts or laws, or decision of court; then the [State Police] shall have the right to cancel this Lease [through one month's written notice.]" Lease, R.R. 38a.

First National Community Bank (FNCB). Stipulated Facts, R.R. 30a; Lease Cover Sheet, R.R. 31a. Developer thus was directly responsible for $1,542,740 in costs – defined as "unamortized costs" in the Lease. *See* Stipulated Facts, R.R. 30a. The FNCB loan is intended to "fund the purchase of the Premises, to finance the construction of the Project and to pay for closing costs." Loan Agreement, R.R. 209a. Through the loan agreement, FNCB required the State Police's "annual rent [be] sufficient to cover [Developer's] debt service and all real estate taxes and insurance on the Premises." *Id.*, R.R. 221a. On the same date it consummated the loan agreement, Developer purchased the land on which the project would be built for $1.5 million. *See* Stipulated Facts, R.R. 30a.

### B. Department of Labor and Industry intercedes

After the Lease was executed, Developer sought confirmation from the Department of Labor and Industry, Bureau of Labor Law Compliance, that, despite language in the Lease to the contrary,[5] the project was not subject to the PWA. However, on February 7, 2020, the Bureau ruled that the project was governed by the PWA:

> While your company will provide the initial funds for this project, the lease payments from State Police will reimburse this initial outlay and, as such, are the ultimate funding source for this construction. The lease spells out with detail the exact specifications for the construction that is to occur and, tellingly, provides that the PWA applies to this construction. Thus, the lease is essentially a construction contract because without the lease the construction would not have occurred. As such, the PWA covers all construction to renovate the space [the] State Police is leasing.

Letter, 2/7/2020, at 2, R.R. 2a.

Developer filed a notice of grievance from the Bureau's decision to the PWAB. After the parties submitted a joint stipulation, the PWAB rejected Developer's grievance:

---

[5] The issue of whether Developer is **contractually** required to pay prevailing wage rates for the project is not before this Court.

As the Lease Agreement was required by the lender in order for [Developer] to obtain financing, the terms of the Lease Agreement and the Loan Agreement must be read in tandem.

… [Developer] failed to establish that it alone bears the financial risk and obligation associated with the construction of the Project. [Developer] contends that the risks and obligations [associated] with the construction funding fall solely on [Developer] under the terms of the Loan Agreement between [Developer] and the lender bank. The amount of the loan provided for in the Loan Agreement is $15,400,000.00. However, the Lease Agreement provides repayment of the amortized construction costs in the amount of $15,615,940.00, either through rental payments made by the Commonwealth or reimbursement if the lease is terminated or cancelled. As such, [Developer] does not solely bear the financial risk associated with the Project.

… [W]e believe that there is a public financing component for the construction of the Project. The purpose of the loan is to provide funds to purchase the premises and to finance construction of the Project. The Loan Agreement requires that the Lease must provide annual rent to be paid by the Commonwealth that is sufficient to cover [Developer's] debt service, which specifically includes construction of the Project. As such, it is clear that the terms and conditions in the Loan Agreement establish that the Commonwealth has a significant role in funding the construction work.

Lastly, we do not believe that the relationship between [Developer] and the Commonwealth is that of a simple landlord and tenant. The Lease constitutes a "build to suit" lease arrangement between [Developer] and the Commonwealth. The plans and specifications set forth in the Lease Agreement were designed specifically for the State Police's intended use of the facility as a barracks and training facility and the Lease requires [Developer] to construct the building facilities within a specific enumerated timeline. Once construction was complete, the State Police would take occupancy of the building facilities and begin lease payments to [Developer] for the term of the 20-year lease. In addition, the Lease Agreement required that prevailing wages be paid to workers in the construction of the building.

Final Decision and Order, 5/17/2022 at 9-11, R.R. 275a-277a. Developer appealed the PWAB's decision to the Commonwealth Court.

## II. COMMONWEALTH COURT DECISION

In a unanimous, three-Judge, published opinion, the Commonwealth Court reversed the PWAB. The panel classified the issues before it as turning on a "single legal question of whether construction of the facility is public work subject to the Act." *PSP NE,*

*LLC v. Pa. Prevailing Wage Appeals Bd.*, 292 A.3d 1175, 1178 (Pa. Cmwlth. 2023). The Court recognized that the PWA is a remedial Act designed to protect workers from being paid less than the prevailing minimum wage on public work projects. It highlighted Section 2 of the Act, which this Court has defined as requiring "(1) there must be certain work; (2) such work must be under contract; (3) such work must be paid for in whole or in part with public funds; and (4) the estimated cost of the total project must be in excess of $25,000."[6] *Id*. at 1179 (citation omitted). The Court then explained that if a grievant can establish the contract at issue is a *bona fide* lease, the burden shifts to the Bureau to "establish that the economic reality of the transaction is different from its appearance." *Id*. (*citing Hance*, 33 A.3d at 573-574).[7]

The Court concluded that the Commonwealth agreed to pay "rent for the use and occupancy of the premises and not for construction." *PSP NE,* 292 A.3d at 1182 (*citing* Lease at ¶ 4) (internal quotation marks and brackets omitted). Further, Developer paid for the construction and is solely responsible to repay the construction loan. *See id*. The Court highlighted the Bureau's stipulation that "no funds will be provided directly by the Commonwealth for the purchase, development and construction of the facilities." *Id*. (emphasis and citation omitted).

The Court then minimized the fact that the Lease requires the Commonwealth to reimburse Developer for unamortized costs. *See PSP NE*, 292 A.3d at 1182. "An early termination of the lease at the end of year 10, for example, would leave unamortized costs substantially below $15,615,940, possibly as little as half that amount." *Id*. (*citing*

---

[6] There is pending legislation to increase the $25,000 "floor" to $257,000. *See* 2025 House Bill No. 160.

[7] The *Hance* Court used the term "*bona fide*" twice without providing an explicit definition. *See Hance*, 33 A.3d at 575, 577. The opinion merely distinguishes a *bona fide* lease from a construction contract. *See id*. at 575.

Developer's Brief at 19-20). Regardless of whether the Commonwealth would be required to pay the unamortized costs under these circumstances, the Court noted that Developer "will nevertheless be liable for as much as $10 million on the bank loan." *Id*. (*citing* Developer's Brief at 19-20).

The Court concluded the PWAB erred in determining the Lease was not a *bona fide* lease. *See PSP NE*, 292 A.3d at 1182. The Court opined that the PWAB failed to give any weight to Developer's reversionary interest in the project which "facially" supports a conclusion that the Lease is *bona fide*. *See id*. (*citing Hance*, 33 A.3d at 575).

Based on that conclusion, the burden shifted to the PWAB to show that the economic realities were different from a lease. The Court found that the PWAB presented no evidence to meet that burden. *See PSP NE*, 292 A.3d at 1182-1183. It rejected the PWAB's "suggestion" that Section 32 of the Lease,[8] requiring compliance with the PWA, was in any way relevant to whether the project is a "public work." *Id*. at 1183.

Finally, the Court rejected the argument that the possible 30-year term of the Lease qualifies under the Tax Code as a real estate transfer requiring the payment of realty transfer tax. *See PSP NE*, 292 A.3d at 1183. The Court opined that the initial term of the

---

[8] Section 32 of the Lease provides, in relevant part:

> Payment of Prevailing Minimum Wages. Lessor and Lessor's contractor(s) must comply with the following conditions, provisions, and requirements in the construction of the building, substantial rehabilitation of the building and/or substantial alterations to the Premises:

> a. Lessor and Lessor's contractors shall pay at least the wage rates as determined by the Secretary of the Pennsylvania Department of Labor and Industry and shall comply with the conditions of the *Prevailing Wage Act of August 15, 1961, 43 P.S. § 165-1 et seq.*, and the regulations issued thereto, to assure the full and proper payment of the rates.

Lease, R.R. 52a (emphasis omitted).

Lease is only 20 years, and the Commonwealth's exercise of its two five-year options was entirely speculative. *See id.*

## III. ISSUES ON APPEAL TO THIS COURT

We granted the Bureau's petition for allowance of appeal to explore how the *Hance* test works in practice. We proposed three issues for the parties to address:

1. Is risk allocation the only consideration in determining whether a pre-construction lease is covered by the Prevailing Wage Act?

2. How much risk must a developer bear to ensure that public funds do not "in part" pay for construction under *500 James Hance Court v. Pa. Prevailing Wage Appeals Bd.*, 33 A.3d 555 (Pa. 2011), such that a pre-construction lease does not implicate the Prevailing Wage Act?

3. Under *Hance*, what is the distinction between a grievant's burden to prove a "facially legitimate lease" and the Board's burden to prove "that the economic reality of the transaction is different from its appearance?"

*PSP NE, LLC v. Pa. Prevailing Wage Appeals Bd.*, 318 A.3d 1262-1263 (Pa. 2024) (brackets omitted).

## IV. STANDARD OF REVIEW

The questions before us concern the correct application of the PWA and are issues of statutory construction. As a result, our primary duty is to determine and apply the Legislature's intent in enacting the statute. *See Crown Castle NG East LLC v. Pa. Pub. Util. Comm'n*, 234 A.3d 665, 674 (Pa. 2020). While "[t]he best indication of legislative intent is the plain language of the statute[,]" we identify the plain meaning by considering "the statutory language in context and give words and phrases their common and approved usage." *Id*. (citations and internal quotation marks omitted). We do not read the provisions in isolation, but instead understand each provision in the context of the entire statute. *See A.S. v. Pa. State Police*, 143 A.3d 896, 906 (Pa. 2016).

## V.     THE PREVAILING WAGE ACT

As noted above, the PWA is what is known as a "Little Davis-Bacon Act." The federal Davis-Bacon Act, as amended in 1935, requires the payment of a "prevailing wage" to workers on federal construction contracts. *See* Kupchinsky, 21 WIDENER L.J. at 105. Before 1961, prevailing wage requirements in Pennsylvania were established by a patchwork of state and local enactments. *See id*. The PWA was enacted in 1961 to create a comprehensive system with uniform state-wide application. *See id*. at 105-106.

The central duty set forth in the PWA is contained in Section 165-5: "Not less than the prevailing minimum wages as determined hereunder shall be paid to all work[ers] employed on public work." 43 P.S. § 165-5. "Public work" is defined as:

> [C]onstruction, reconstruction, demolition, alteration and/or repair work other than maintenance work, done under contract and paid for in whole or in part out of the funds of a public body where the estimated cost of the total project is in excess of twenty-five thousand dollars ($25,000), but shall not include work performed under a rehabilitation or manpower training program.

43 P.S. § 165-2(5). Notably, public bodies have an affirmative duty to comply with the PWA:

> It shall be the duty of every public body which proposes the making of a contract for any project of public work to determine from the secretary the prevailing minimum wage rates which shall be paid by the contractor to the [worker] upon such project. Reference to such prevailing minimum rates shall be published in the notice issued for the purpose of securing bids for such project of public work. Whenever any contract for a project of public work is entered into, the prevailing minimum wages as determined by the secretary shall be incorporated into and made a part of such contract and shall not be altered during the period such contract is in force.

43 P.S. § 165-4.

The PWA is a remedial statute intended to protect workers on public works projects from substandard pay. *See Pa. Nat. Mut. Cas. Ins. Co. v. Dep't. of Labor and Indus.*, 715 A.2d 1068, 1072 (Pa. 1998) ("*Penn National I*"). It accomplishes that goal by having the

Department of Labor calculate a "prevailing minimum wage," and then requiring that workers on public works projects be paid at least that amount.

The seminal case interpreting the PWA is *Penn National I*. There, this Court utilized a four-step test to determine whether a project qualifies as "public work" under the PWA: "(1) there must be certain work; (2) such work must be under contract; (3) such work must be paid for in whole or in part with public funds; and (4) the estimated cost of the total project must be in excess of $25,000." *Penn National I*, 715 A.2d at 1074. While elements one, two, and four of the *Penn National I* test have some litigation history, the source of most disputes on the scope of the PWA is element three – the "paid for … with public funds" element. *Id.*

### A.    The "paid for … with public funds" element

There are two distinct types of disputes under element three: (a) whether the funds used to pay for the project were "public funds" (nature of funding dispute) and (b) whether admittedly public funds paid for the construction (causation dispute).

*Penn National I*, arose from a causation dispute. There, public funds paid for demolition and asbestos removal at a building owned jointly by the City of Harrisburg and a redevelopment authority. Once the asbestos was removed and the existing building demolished, the property was conveyed to a private company, PNI (or in the end, PNI's wholly owned subsidiary known as PNRT)[9] to construct a new building for its own purposes. The Commonwealth Court affirmed an administrative ruling that the entire project was paid for with public funds since the asbestos removal was publicly funded. In essence, the Commonwealth Court "looked at the whole project as a comprehensive undertaking." *Penn National I*, 715 A.2d at 1074.

---

[9] *See Pa. State Bldg. and Const. Trades Council, AFL-CIO v. Prevailing Wage Appeals Bd.*, 808 A.2d 881, 891 n.2 (Pa. 2002) (Saylor, J., dissenting) ("*Penn National II*").

This Court held to the contrary, determining that only the asbestos and demolition work qualified as "public work" under the PWA. *Penn National I*, 715 A.2d at 1074. To do so, this Court determined that the construction work was distinct from the asbestos and demolition work. Since the demolition phase was distinct from the construction phase, this Court found that the subsequent construction phase was not paid for with public funds simply because the initial, demolition, phase was publicly funded. *See id*.

Nonetheless, the rest of the construction project was financed through a Tax Increment Financing ("TIF") district. TIF districts are economic development subsidies authorized by the Tax Increment Financing Act, 53 P.S. §§ 6930.1 - 6930.13. This Court opined that the factual record was insufficiently developed to allow the Court to address whether the TIF financing scheme meant that the second phase of the project was paid for by public funds. *See Penn National I*, 715 A.2d at 1075. As a result, the Court remanded for further proceedings.

Those proceedings ultimately culminated in *Penn National II*. *Penn National II* arose from a dispute over the nature of the funding: whether the TIF funds were public funds. After further development of the record on remand, the Commonwealth Court held that the TIF district financing used public funds to pay for the project, and the PWA applied to the remainder of the construction project. *See Penn National II*, 808 A.2d at 886. We affirmed, explaining how the TIF district used public funds to pay for the work. First, the redevelopment authority issued bonds in the amount of $10.5 million. *See id*. The redevelopment authority was not liable in any way for repayment of the bonds, but instead the payments would be satisfied through a tax increment fund which was funded through payments from various local tax authorities that all had agreed to participate in the TIF district. *See id*. At its simplest, the scheme allowed local authorities to maintain their existing tax income from the current assessed value of the properties in the TIF district.

However, any increase in tax income received by the taxing authorities (generally through an increase to the assessed value which is presumed to arise from the development of the property) after the completion of the project were then sent to the tax increment fund for 20 years, which used this revenue to pay off the bonds. *See id*. at 886-887.

Interestingly, the TIF bonds were purchased by PNI, which was the parent company of the TIF district property owner, PNRT. Thus, the financing scheme flowed as follows. PNI paid $10.5 million to purchase bonds from the redevelopment authority. The terms of the bonds promised that PNI would be repaid the principal ($10.5 million) plus interest over 20 years. PNI's $10.5 million payment was placed in a sinking fund to pay PNRT a portion of the construction costs for the building. PNRT, as property owner, paid taxes to the local authorities. During the 20-year term, any increase in tax revenues generated from the property to those authorities would then be turned over to the tax increment fund. The tax increment fund would periodically disburse payments to PNI according to the terms of the bonds. In essence, PNI was self-financing the construction, but receiving a modest sum of tax-derived income through the interest on the TIF bonds over the 20-year life of the bonds. Of note, self-financing is not required for TIF districts — the bonds can be sold on the open market to third parties. But PNI kept the financing "in house."

The *Penn National II* Court concluded that

the monies paid to the taxing authorities as tax increments, which, in turn, are used to pay off the bonds that are used to pay the cost of construction are public funds for purposes of the [PWA.] … [P]ursuant to the TIF Act, the taxing bodies actually collect the tax increment dollars in question. Although the taxing bodies only retain the monies paid on the property's tax base and the tax increment dollars are paid over to the trustee to be used to pay off the tax increment bonds, nevertheless … for a time these monies do rest in the public coffers. Significantly, the statutory financing at issue here is not a tax abatement, where the taxing authority agrees to forego receiving property taxes on a certain property for a certain time. To the contrary, the tax money is actually collected by the taxing bodies, and, in

turn, these dollars are used to pay off the tax increment bonds that are used to pay the cost of construction on the project.

*Penn National II*, 808 A.2d at 889 (footnote omitted).

In sum, these two cases established the contours of the "paid for … with public funds" requirement under the PWA. In *Penn National I*, this Court addressed a causation dispute and held that if a project is separated into distinct phases based on economic realities — not purely a desire to evade the application of the PWA — the project is to be assessed based on whether public funds paid for each phase independently.[10] The Court in *Penn National II* built upon this framework by addressing a nature of funding dispute. Noting the plain language of the PWA simply required the work be done under contract, the Court rejected the assertion that the public body needed to be a party to the construction contract. *See Penn National II*, 808 A.2d at 890. Thus, direct payment of public funds to contractors is not required to establish the applicability of the PWA; reimbursement of such costs is sufficient. *See id*. at 889 ("[T]he tax money is actually collected by the taxing bodies, and, in turn, these dollars are used to pay off the tax increment bonds that are used to pay the cost of construction on the project.").

More recently, this Court addressed the issue of what constitutes "public funds" under the *Penn National I* test. *See Ursinus Coll. v. Prevailing Wage Appeals Bd.*, 310 A.3d 154 (Pa. 2024). *Ursinus College* arose from a dispute over the nature of the funding; there was no question the funds at issue "paid for" the project. There, a private college

---

[10] In this respect, Pennsylvania differs from other jurisdictions that have Little Davis-Bacon Acts. For example, California's Little Davis-Bacon Act requires the payment of a prevailing wage on "public works projects." *Cinema West LLC v. Baker*, 220 Cal.Rptr.3d 415, 423 (2017). And "public works" is defined as "[c]onstruction, alteration, demolition, installation, or repair work done under contract and paid for in whole or in part out of public funds." *Id*. (citation omitted). The California Court of Appeals concluded that a private theater developed concurrently with a publicly funded parking lot was part of a "complete integrated object" and as a result was subject to the prevailing wage requirement. *See id*. at 431-432.

sought to erect new buildings through the issuance of tax-exempt bonds. To be tax-exempt, the bonds had to be issued through a county authority.[11] Thus, the private college utilized a county higher education authority to issue tax-exempt bonds to finance the construction. *See id*. at 163. While the authority was the nominal issuer of the bonds, it bore no liability for paying them off — the college was solely liable on the bonds. *See id*. at 165-166. Those bonds were purchased by a private underwriter. *See id*. at 164. In turn, the proceeds from the sale were deposited directly into a trust fund managed by a private bank and designated solely to pay for the costs of the construction project. *See id*. at 165.

We observed that nothing about Section 165-2(5)'s phrase "paid for in whole or in part out of the funds of a public body" is ambiguous or unclear. *Ursinus College*, 310 A.3d at 172. After reviewing dictionary definitions of the various words at issue, this Court opined that the phrase "paid for … out of the funds of a public body" requires "the receipt of payment … from available pecuniary resources from or possessed by" the Commonwealth or its agents. *Id*. (citation omitted). Nonetheless, application of Section 165-2(5) does not involve simply accepting the plain language of how the parties label a transaction. *See id.* Instead, we must independently examine the "economic reality" of the transaction to determine whether the PWA applies. *Id*. (citation omitted). We noted this result is congruent with *Penn National II*, since there, the construction was paid for with funds that were collected as taxes. *See id*. at 174. We also stated the *Penn National II* majority explicitly distinguished the case before it from tax abatement cases, where the

---

[11] Though the opinion does not explicitly address the issue, the Court did not acknowledge any dispute over whether the county authority qualified as a public body. The opinion focuses exclusively on whether any funds of the county authority were utilized in the transaction.

taxes are never collected and therefore never possessed by the relevant public body. *See id*.

*Ursinus College* tied its analysis directly to the language of the PWA and held the PWA does not apply when the payment for the construction does not include assets owned by the Commonwealth or any of its agencies.

**B.    "Paid for … with public funds" as applied to pre-development leases**

Nearly a decade after *Penn National II*, but over a decade before *Ursinus College*, this Court addressed the application of the PWA to pre-development leases. *See Hance*, *supra*. *Hance* arose from a causation dispute: there was no dispute over the legal nature of the funds at issue, only whether those funds were paid in exchange for construction. There, the lessor was a developer who agreed to construct and lease a building to a charter school.[12] The original lease agreement required the charter school to pay rent as well as make a $1.6 million payment which was titled a security deposit. This security deposit was to be used by the lessor to purchase materials and equipment for the interior fit-out of the building to suit the charter school's needs. *See id*. at 558. After five years, the charter school had an option to purchase the building. *See id*.

The Bureau of Labor Law Compliance intervened shortly after the original lease agreement was executed. *See Hance*, 33 A.3d at 558. In response to the Bureau's inquiry, the school asserted that since the lessor bore the responsibility for the construction of the building, the school did not contract for construction of the building. *See id*. The school's initial response did not address the $1.6 million security deposit. *See id*. at 559.

---

[12] Technically, the lessee was a foundation associated with the charter school. The foundation and the charter school subsequently merged and the Court treated the two bodies interchangeably for purposes of the appeal. *See Hance*, 33 A.3d at 558 n.3. Further, for reasons arising from the law authorizing charter schools, the charter school was treated as a public body. *See id*. at 557-558.

The Bureau subsequently determined the PWA applied to the project based on the circumstances of the lease agreement: (1) the school's status as lessee; (2) rental payments exceeding $600,000 annually; (3) the school's option to purchase after five years; (4) the $1.6 million security deposit; (5) the leasehold mortgage obtained by the school, which was authorized by the lease agreement and a condition of the financing the school utilized to pay the security deposit; and (6) the intended use of the building as a charter school.  *See Hance*, 33 A.3d at 559.

The lessor lodged a grievance of the determination with the PWAB.  In its grievance, the lessor conceded for the first time that the interior fit-out of the project was subject to the PWA.  *See Hance*, 33 A.3d at 559.  The lessor maintained, however, that there was a bright-line distinguishing the fit-out — which the lessor now alleged was to be undertaken at the school's sole cost — and the construction of the building's shell — which the lessor asserted was its sole responsibility.  *See id*. at 559-560.  Thus, the lessor argued the construction of the building's shell was not subject to the PWA.

The original lease agreement, however, did not support any of these distinctions.  *See Hance*, 33 A.3d at 560.  In apparent recognition of this deficiency, the lessor attached a different, unexecuted lease to its grievance which supported its litigation position.  *See id*.  Notably, the lessor did this without acknowledging that this was not the original lease agreement.  *See id*.  Further, the lessor asserted that its intent to construct the shell building predated the school's involvement.  *See id*.

An amended lease was subsequently executed by the lessor and the school that provided for bifurcation of the project into two stages:  the exterior shell and interior fit-out.  *See Hance*, 33 A.3d at 560.  The security deposit was explicitly deleted from the amended lease.  *See id.*  On the same day the amended lease was executed, the lessor also: (1) amended its construction contract to reflect the bifurcation of the project; and (2)

obtained private financing for the construction of the shell. *See id*. at 560-561. The school subsequently entered into its own construction contract for the interior fit-out. *See id*. at 561.

The PWAB concluded that the PWA applied to the whole project — both the construction of the shell and the internal fit-out — and denied the lessor's grievance. *See Hance*, 33 A.3d at 562. In doing so, the PWAB adopted a test developed by the United States Labor Department's Administrative Review Board (U.S. ARB) in applying the federal Davis-Bacon Act, referred to as the *Phoenix Field Office* test.[13] *See id*. at 563. There, the U.S. ARB addressed circumstances that are strikingly similar to the present case:

> In April 1998 the [U.S. Department of the Interior's] Bureau of Land Management [("BLM")] issued a solicitation inviting bids for a leased facility in Phoenix, Arizona. **BLM identified the solicitation as a 15-year lease, with a 'firm' lease period of 10 years**, i.e., the government could terminate the lease after the first 10 years. The solicitation specified precisely the geographic boundaries of the area within Phoenix that would be acceptable to BLM, and described the size and architectural design of the project with significant, particularized detail[.]
>
> …
>
> From the offers received, BLM decided to award the lease contract to Federal Builders, LLC, which proposed to build a new facility to meet BLM's needs.

*In re Phoenix Field Office, Bureau of Land Mgmt.*, ARB Case No. 01-010, 2001 WL 944696 (June 29, 2001) (emphasis in original; citations omitted). Addressing the question of whether the construction of the new building was covered by the Davis-Bacon Act, the U.S. ARB applied a totality of the circumstances test. *See id* at 5. Specifically, the U.S. ARB considered:

---

[13] *In re Phoenix Field Office, Bureau of Land Mgmt.*, ARB Case No. 01-010, 2001 WL 944696 (June 29, 2001).

the length of the lease, the extent of government involvement in the construction project such as whether the building is being built to Government requirements and whether the Government has the right to inspect the progress of the work, the extent to which the construction will be used for private rather than public purposes, the extent to which the costs of construction will be fully paid for by the lease payments, and whether the contract is written as a lease solely to evade the requirements of the Davis-Bacon Act.

*Id*. (citation omitted).

Applying the *Phoenix Field Office* test to the lease before it, the PWAB concluded the PWA applied since the initial lease term was 24 years, the charter school was the sole use for the construction project, the rent payments would fully pay for the shell construction after six years, and, notably, the lessor had not met its burden because it failed to place the plans and specifications for the building into evidence. *See Hance*, 33 A.3d at 564. Of further note, the PWAB did not address the lessor's allegation that it would have proceeded with the project even in the absence of the contract with the charter school. *See id*. at 565.

The Commonwealth Court reversed but did not address the PWAB's use of the *Phoenix Field Office* test. *See Hance*, 33 A.3d at 566 ("Without discussing the *Phoenix Field Office* test, which lay at the heart of the Board's determination … the Commonwealth Court majority pronounced that rent payments simply are not the equivalent of construction funding.") . Instead, the Commonwealth Court majority concluded the PWAB failed to provide any support for its conclusion that the rent payments were in fact payments for construction of the shell building. *See id*. A dissent, authored by Senior Judge Kelley, observed that the evidence before the PWAB established the shell building would not have been built but for the lease agreement with the charter school. Accordingly, the dissent concluded the PWA applied. *See id*.

This Court accepted review of the Bureau's appeal to address the applicability of the *Phoenix Field Office* test and the sufficiency of the evidence to establish PWA

coverage. *See Hance*, 33 A.3d at 569 ("The present case is centered on the correctness of the legal framework employed by the Board to resolve Appellees' grievance and on evidentiary sufficiency."). As defined by the *Hance* majority, the issue before the Court was "whether the *Phoenix Field Office* test, or some other appropriate litmus, should pertain to screen against artful drafting of contracts to evade wage regulation." *Id.* at 572.

The *Hance* majority began by noting "the pre-development lease scenario most closely implicates the element entailing payment, in whole or in part, with public funds[.]" *Hance*, 33 A.3d at 572 (citations omitted). Pursuant to the amended lease before the *Hance* Court, the construction of the building shell was "facially" privately funded. *Id.* Nonetheless, the majority opined that "the labels appended to transactional documents do not exclusively determine the applicability of regulation" under the PWA. *Id.* Instead, the "economic reality" of the transaction controls whether the PWA applies. *Id.* (citation omitted).

After briefly setting forth the *Phoenix Field Office* test, the majority quickly dismissed it, opining that the test only provided "generalized guidance" and was loosely related to the question of whether the PWA should apply. *Hance*, 33 A.3d at 572. Most important to the majority, the *Phoenix Field Office Test* failed to "account sufficiently for a key aspect of business transactions, namely, the allocation of risk." *Id.* at 573. Thus, the *Hance* majority clearly held the Board's exclusive use of the *Phoenix Field Office* test was improper. *See id.* at 572 ("In view of the looseness inherent in the framing of the *Phoenix Field Office* factors, we do not believe it would be useful for us to adopt them here."). The Court refused to defer to the Board on this issue as the Board's interpretation was "imprudent or inconsistent with legislative intent." *Id.* at 573 (citation omitted).

Instead, the *Hance* majority imported a test developed by the United States Supreme Court to determine ownership of property for the purpose of calculating federal

income tax obligations. *See Hance*, 33 A.3d at 573 (*citing Frank Lyon Co. v. U.S.*, 435 U.S. 561, 576-577 (1978)). According to the majority, the *Lyon* test's focus on risk allocation appropriately reflected the prominence of risk allocation in assessing the economic reality of a transaction for the purpose of applying the PWA. As such, the majority opined that

> a grievant which presents evidence that it is incurring the risk and obligations of an owner/mortgagor in construction, that there is no public-financing component in the work … [or] relevant major phase of construction … and that its relationship with the covered entity is as a lessor under a facially legitimate lease, has established a *prima facie* case that wage regulation is not implicated[.]

*Id*. Once the grievant has established this *prima facie* case, the majority held that it was the Bureau's burden to present evidence that "the economic reality of the transaction is different from its appearance." *Id*. at 573-574. "Where the Bureau does so sufficiently, the ultimate burden should rest with the grievant." *Id*. at 574 (citations omitted).

In applying its burden shifting test, the *Hance* majority declined to "hypothesize the range of circumstances which might counterbalance a *prima facie* case in the pre-development lease setting." *Hance*, 33 A.3d at 574. Instead, the majority concluded the Bureau had failed to establish the economic reality of the transaction was inconsistent with the label "lease." In doing so, it rejected several arguments to the contrary.

First, the majority noted the fact that rent payments would allow the lessor to recoup construction costs in six years. Interestingly, it opined "it is evident that few office buildings would be built if the construction costs, including the cost of servicing the construction loan, could not ultimately be recouped by anticipated lease payments within a reasonable time frame." *Hance*, 33 A.3d at 574. Instead, analogizing the application of the PWA to the issue of whether a lease of goods gives a lessor a security interest in the goods, the majority questioned the relevance of these circumstances in the absence of evidence establishing whether the six-year term was "substantially shorter than the

industry norm[.]" *Id*. (citation omitted). The majority did not explain how evidence of the industry norm should be obtained by the Bureau or even if such a norm exists in a market where the assets are generally considered unique, based on factors such as convenience to market, availability of infrastructure, weather risk, subjective aesthetic concerns, and local governance.

Similarly, once again relying on its conception of risk allocation and ownership, the *Hance* majority rejected the Bureau's reliance on the fact that the charter school was the sole tenant of the building. The majority questioned the relevance of this circumstance absent "more pertinent information," as the sole tenancy "may simply follow from the size of the building and the School's needs." *Hance*, 33 A.3d at 575. It also dismissed the Bureau's reliance on the existence of the school's option to purchase the building after five years. If the school exercised its option at five years, "its lease payments will have already nearly paid for the cost of constructing the shell, including financing costs, and the sum of its lease payments and the purchase price will be nearly twice the construction costs." *Id*. Left unexplained is how this circumstance demonstrated the lessor bore all (or any of) the risk in the transaction.

The *Hance* majority then identified several other circumstances that it opined were inconsistent with the lease "being a disguised build-to-suit contract." *Hance*, 33 A.3d at 575. First, the school was not permitted to make any alterations to the property without the lessor's permission after the fit-out was completed. *See id*. Second, the agreement required the school to make the property available to the lessor for inspection during normal business hours and during an emergency. *See id*.

Based on this analysis, the majority opined that the lessor had met its burden of establishing a *prima facie* lease, *i.e.*, its "only relationship with the [charter school] was

per a *bona fide* pre-development lease. The Bureau failed to go forward with sufficient evidence to the contrary to overcome this *prima facie* case." *Hance*, 33 A.3d at 576-577.

Thus, *Hance* built upon the *Penn National I* test by importing considerations of "ownership" and "risk allocation" into the "paid for … with public funds" element. To accommodate these new concerns, *Hance* created a novel burden-shifting test to be applied only when a pre-development lease is at issue. Under *Hance*, a "facially legitimate lease" is entitled to a presumption that the PWA does not apply — though this Court provided little guidance as to what qualifies as facially legitimate. *Hance*, 33 A.3d at 574. In its own words, the *Hance* majority opined this presumption can only be overcome by proving, by a preponderance of the evidence, that "the economic reality of the transaction is different from its appearance." *Id*. at 573-574. While the *Hance* majority failed to clarify the issue, this burden would arguably require the presentation of expert opinion on the question of the economic reality of the transaction. *See id*. at 574 (noting that recoupment of construction costs through six years of rent payments is "of little probative value relative to the question of whether the lease is a disguised construction contract, absent proofs regarding whether a six-year recoupment period is substantially shorter than the industry norm for building shells of the type involved here" (citation omitted)). If the presumption is rebutted, then the grievant bears "the ultimate burden[.]" *Id*. (citations omitted). Left unsaid were the contours of this burden given that the Bureau already would have established, by a preponderance of the evidence, that the economic reality of the transaction was not a lease.

In a dissent joined by Justice Seamus McCaffery, then-Justice Baer first criticized the *Hance* majority for utilizing tax law principles in the context of the PWA:

> I conclude that the tax avoidance precedent is inapt. Our Rules of Statutory Construction classify statutes imposing taxes as one of the few categories that must be strictly construed against taxation by courts. This strict construction against the imposition of taxes is entirely consistent with our

established national view of taxes. … The [PWA], however, is not a statute imposing taxation which is to be strictly construed. Instead, it is a remedial statute subject to an opposite rule of statutory construction. It is to be **liberally construed to effectuate its objective to protect workers' rights to adequate pay when engaged in public work projects**.

*Hance*, 33 A.3d at 578 (Baer, J., dissenting) (citations omitted; emphasis added).

The dissent also criticized the majority's insertion of "risk allocation" into the PWA without any basis. *See Hance*, 33 A.3d at 579. Instead, the dissent determined that the *Phoenix Field Office* test better reflected the explicit language of the PWA. *See id*. at 579-580. As such, the dissent concluded that the PWAB's application of the *Phoenix Field Office* test was appropriate. *See id*. at 580.

## VI. APPLYING *HANCE* TO THE STATE POLICE LEASE

We accepted review of this case to determine several specific questions raised by the Commonwealth Court's analysis. First, whether the Commonwealth Court's exclusive reliance on risk allocation was proper under *Hance*. Second, the propriety of the Commonwealth Court's conclusion that, despite several circumstances demonstrating the State Police bore at least some of the risk, Developer's risk exposure was sufficient to excuse the project from prevailing wage requirements. And third, we sought a clarification of what constitutes a *prima facie* case that an agreement is a facially legitimate lease.

### A. Is risk allocation the only relevant factor?

Neither party before this Court provided an explicit answer to this question. The Bureau argues that *Hance* is entirely distinguishable on the facts. The Bureau asserts the only relevant question is whether public funds paid for the construction of the barracks. It then answers its own question by asserting that public funds undisputedly paid for the construction. Similarly, Developer does not explicitly address the question presented. Instead, Developer argues the central issue of this case is whether public funds paid for the construction of the barracks.

We agree with the parties to the extent that our analysis must flow from the explicit language of the statute. Given that focus, it is immediately obvious that the *Hance* majority failed to define what a facially legitimate lease is. Thus, to apply *Hance* on its own terms, we must do what *Hance* failed to do: define what a lease is.

As even the *Hance* majority acknowledged, our analysis does not end with the title of the document. The question is, how far beyond the mere title must we go to determine whether a purported lease is facially legitimate? Since "lease" is not contained in the PWA, it is not explicitly defined therein. In these circumstances, we turn to dictionary definitions of the terms to guide our analysis.

A "lease" is "[a] contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration, [usually] rent." Black's Law Dictionary (12th Ed. 2024) ("LEASE"). In turn, "rent" is defined as "[c]onsideration paid, [usually] periodically, for the use or occupancy of property[.]" *Id*. ("RENT"). The *Hance* test starts with the assumption that a facially legitimate lease is legally distinct from a "construction contract." A "construction contract" is "[an agreement between two or more parties,] setting forth the specifications for a building project's construction." *Id*. ("CONTRACT").

It is immediately apparent that a lease contract and construction contract are not mutually exclusive categories. It requires little imagination to envision a contract that requires the lessor to both construct a building and to provide the lessee with the right to use and occupy the building in exchange for rent. Indeed, the *Hance* majority implicitly acknowledged that a contract can be both a lease and a construction contract when it distinguished the lease before it from "a disguised build-to-suit contract." *Hance*, 33 A.3d at 575.

However, the parties have not meaningfully advanced the analysis beyond what is stated in *Hance*: "risk allocation should be a prominent consideration in assessing the economic reality of a business transaction and, in particular, a lease[.]" *Hance*, 33 A.3d at 573. Neither party contends that risk allocation should be the sole determining factor. *See* Bureau's Brief at 35; Developer's Brief at 38. Given this agreement, we must conclude the Commonwealth Court here erred. The Commonwealth Court failed to appreciate the other aspects of the Lease Agreement (and other attendant circumstances) that support a different conclusion. *See PSP NE*, 292 A.3d at 1184 (concluding the Bureau failed to rebut Developer's *prima facie* case because it "presented no evidence that the timeline for Developer's expected recoupment of construction costs was 'substantially shorter than the norm'" (citation omitted)).

As both parties concede, the essential question is whether admittedly public funds — payments from the State Police under the Lease — "paid for" construction of the barracks. *See* 43 P.S. § 165-2(5). This is a causation dispute, not a nature of the funding dispute.

This issue is distinct from the "but for" test we rejected in *Ursinus College*. There, we held that the mere involvement of a government entity for pass-through financing did not transform private funds into public funds:

> According to the evidence of record, at no point did either the monies used to pay the Project costs or the monies used to service the bond debt ever enter, rest in, or otherwise flow through the Authority's coffers. Moreover, no Authority or taxpayer funds were used to secure the bonds; neither the Authority nor taxpayers bore any risk or liability relative to the bonds. In short, the Project work was marked by the receipt of payment, in whole or in part, from the available pecuniary resources from or possessed by the private Trustee (not the Authority) — *i.e.*, the private bond proceeds generated from the sale of the Authority's bonds and deposited in the Project Fund. As such, the Authority simply served as a conduit for financing the Project, a private endeavor.

*Ursinus College*, 310 A.3d at 172-173 (footnote omitted).  Here, in contrast, the question is not whether the rent payments under the Lease come from the pecuniary resources of a government agency.  They undoubtedly do.  Nor is there any intermediary as in *Ursinus College*.  Rather, the State Police pay rent directly to Developer, who is not only the putative landlord, but also, under the same contract, the party responsible for building the barracks.

The question now is whether the rent payments are exchanged, at least in part, for the service of constructing the facility.  In other words, did Developer promise to construct the facility in exchange for the payments from the State Police?  If so, public funds paid for the construction.

To answer the question, this Court must apply a totality of the circumstances analysis, taking into consideration all relevant information, including the *Hance* risk allocation factors, to reveal the economic reality of the transaction.  Although the *Hance* Court found the *Phoenix Field Office* factors too "loose" for its analysis, those factors and the "generalized guidance" they provide prove beneficial herein.

Thus, let us begin the analysis with a clear understanding of the undisputed facts underlying this transaction:  (1) the State Police solicited a detailed proposal from Developer that Developer had no independent plan to build, no other use for, and no other tenant to occupy; (2) in doing so, the State Police dictated its specific needs and requirements for a police training facility; (3) the State Police's occupancy was conditioned upon Developer's satisfactory construction of the training facility; (4) the State Police's rent and other financial obligations were paid for by public funds and tied directly to Developer's debt obligations under the terms of its construction loan; and (5) in the event of early termination, the Lease Agreement obligated the State Police to pay a significant portion of the residual costs of construction.

Although the *Hance* Court was skeptical of adopting the *Phoenix Field Office* test to its unique circumstances, those factors — including the *Hance* risk allocation factor — clearly guide our analysis here. First, the "length of the lease." The initial lease period is 20 years, with the State Police having a right to exercise two five-year options to extend. The length of the lease is at least four times the lease at issue in *Hance*. Thus, it is a "long-term lease of custom built facilities" which "are a common technique used by enterprises … to acquire new buildings." *Phoenix Field Office*. While far from conclusive, this factor suggests the Lease Agreement may be a disguised construction contract.

Next, the extent of government involvement in the construction project. In essence we must assess whether the construction project is to the lessee's specifications or is merely a generic structure such as the building shell in *Hance*. This is especially relevant if the resulting project is unlikely to have a market outside the contracting government agency. Here, there is no indication that Developer was going to build the headquarters facility in the absence of the Lease. Further, the Lease provides that Developer will "[c]onstruct and renovate the Premises" at Developer's cost "and in return for Rent paid by" the State Police, and "in accordance with all plans and specifications set forth" in the State Police's 128-page specifications. Lease, R.R. 43a. Not only does Lease establish that construction is pursuant to the State Police's detailed specifications, but it also explicitly states that the construction is in return for the rent paid by the State Police. As the Bureau contends, the Lease is clearly a build-to-suit agreement, requiring Developer to not only provide use and occupancy, but also construction, of the facility. Here, it is undisputed that the construction of the training facility was performed to the specifications set forth by the State Police in a 128-page

document. This factor strongly supports a conclusion that the Lease Agreement is a disguised construction contract.

The third *Phoenix Field Office* factor is the extent to which the construction will be used for private rather than public purposes. There is no evidence or assertion that any tenant other than the State Police will ever use the training facility. This factor strongly supports a conclusion that the Lease Agreement is a disguised construction contract.

Fourth, the extent to which the costs of construction will be fully paid for by the lease payments. Where construction is financed by a facially private loan, we must examine the financing structure to determine the economic reality of the financing. What appears at a glance to be a private loan, may actually be a disguised conduit for using public funds to finance construction. If the loan agreement requires, as a pre-condition, a lease charging sufficient rent to cover the debt payments under the loan, it is clear that public funds are a pre-condition to the financing of construction costs. On the other hand, if a developer can establish that the construction would have occurred even in the absence of the lease with the public body, this would tend to show that the lease agreement was not merely an attempt to evade the application of the PWA. Here, Developer arguably provided some of the funds for the construction of the training facility, but clearly the bulk of the funding came through a loan from FNCB. The FNCB loan requires that the rent payments — the public funds expended by the State Police — be sufficient to cover Developer's payments on the loan and requires assignment of Developer's rights under the Lease to FNCB. Further, the Lease Agreement obligates the State Police to pay for unamortized costs of the project in the event of early termination of the lease. Since a significant portion, if not all, of the construction costs

will be paid for through the State Police's rent payments, this factor also strongly supports a conclusion that the Lease Agreement is a disguised construction contract.

The fifth and final *Phoenix Field Office* factor, "whether the contract is written as a lease solely to evade" application of the prevailing wage requirement, is a factual inference that can only be answered by a consideration of all the circumstances. Here, we can presume Developer desired to avoid the application of the PWA given the ensuing litigation. Under the specific circumstances of this case, it is not necessary to determine whether this was Developer's sole motivation in structuring the transaction as a lease. Even if we assume that Developer had other motivations, it simply is not enough to overcome the circumstantial evidence establishing that the State Police's rent payments fund the costs of construction.

As noted, *Hance* stated that an additional factor, risk allocation, must be considered. Here, as set forth in **B.** below, we conclude that Developer failed to establish it bore all of the risk in this transaction. As such, this factor also favors a conclusion that the PWA applies to the transaction.

Independent of its risk allocation analysis, the Commonwealth Court relied on Developer's reversionary interest in the facility. *See PSP NE*, 292 A.3d at 1182. It opined that "such a reversionary interest in a predevelopment lease to the developer facially supports the conclusion that the lease is a *bona fide* one and not a construction contract." *Id*. (internal quotation marks omitted). Yet, ownership of the resulting project is not, on its own, a circumstance relevant to the application of the PWA. Nothing in the plain language of the PWA requires the government to obtain ownership of what is being constructed. Instead, the PWA applies when public funds are exchanged for construction services, regardless of who ends up owning the resulting structure. *See 22 S. 40th Street Owner LLC v. Pa. Prevailing Wage Appeals Bd.*, 303 A.3d 857 (Pa.

Cmwlth. 2023) (concluding the PWA applies where private owner used publicly funded grant to pay for historical renovations of its property).[14]  As such, a developer's ownership of the resulting facility is merely one circumstance among many, and its probative value is highly dependent on other circumstances.

To be clear, other factors may, and probably do, exist.  We make no attempt to provide an exhaustive list of possible factors.  As always, a totality of the circumstances analysis means just that — all relevant circumstances should be considered on a case-by-case basis.  *See*, *e.g.*, *Bowser v. Blom*, 807 A.2d 830, 836 (Pa. 2002) (declaring that this Court "need not imagine or account for all conceivable relevant circumstances … in order to render some guidance on the standard").

The totality of the circumstances reveal the economic reality of the transaction is not a *bona fide* lease.  Rather, the Lease clearly contains requirements that Developer construct a facility specifically designed for the State Police's use.  Thus, the Commonwealth Court erred in concluding otherwise.  While this is sufficient on its own to reverse the Commonwealth Court's order, it does not moot the second question presented in this appeal.  We thus turn to that issue.

### B.       How much risk must a developer bear to avoid application of the PWA

Before this Court, Developer asserts that "[t]o satisfy the first and second elements of the *prima facie* case set forth in *Hance*, a developer must bear all of the risk of funding or financing a project[.]"  Developer's Brief at 20.  Developer's assertion is justified by the language of the PWA itself, as a prevailing wage is required if public funds pay for construction even "in part."

Yet, despite Developer's protestations, it does not bear **all** the risk in this project. The State Police may be liable for unamortized costs if the Lease is terminated before the

---

[14] Developer does not request this Court overrule *22 S. 40th Street*.

initial term of 20 years. The unamortized costs of renovation are clearly **not** payments for use or occupancy of the barracks.[15] Even if the State Police are unlikely to terminate the Lease before the full term and thus avoid this payment, the contractual requirement represents a **definite risk** that the State Police, a public entity, may be liable for construction costs. Thus, if, as Developer asserts, a developer must bear **all** development risk to avoid application of the PWA, that requirement is not met here.

Moreover, Developer's construction loan contains a condition precedent requiring Developer to charge the State Police sufficient rent to cover its obligations:

> 2.17 Commonwealth Lease. [Developer] shall have delivered to Lender an executed Lease between [Developer] and Commonwealth of Pennsylvania (the "Lessee") for the Premises reasonably acceptable to Lender **with an annual rent sufficient to cover [Developer's] debt service and all real estate taxes and insurance on the Premises**.

Loan Agreement, R.R. at 221a (emphasis added). The loan agreement also requires Developer to "collaterally assign[] to Lender all of its rights under any and all present and future leases with tenants at the Premises, including, but not limited to, the rents from such tenants." *Id*. at 211a. Thus, through the loan agreement, FNCB guaranteed the creation of an asset, paid for from public funds, that covers part of, if not all of, Developer's financial exposure on the project.

These circumstances may exist in many pre-development leases. As the *Hance* majority noted, "it is evident that few office buildings would be built if the construction costs, including the cost of servicing the construction loan, could not ultimately be

---

[15] It is not entirely clear whether the "unamortized costs of renovation" in the Lease Agreement refers to the original construction of the facility, or only subsequent renovations paid for by Developer at the State Police's request. However, the parties stipulated that if the Lease were to be terminated early, Developer would suffer "a loss of any difference between the total project cost and unamortized costs." Stipulated Facts, R.R. 30a. This stipulation supports the former interpretation. In any event, Developer does not assert that the payment of unamortized costs is in exchange for use and occupancy of the facility.

recouped by anticipated lease payments within a reasonable time frame." *Hance*, 33 A.3d at 574. The economic reality is that a developer does not go into business to assume risk; a developer assumes a subjectively acceptable amount of risk in return for a subjectively acceptable probability of turning enough profit to justify the risk. Every development contract represents a balance between risk incurred and profit expected.

However, this does not change the explicit language of the PWA. The PWA is not an economic development statute, seeking to incentivize development. Instead, it is a remedial statute, seeking to protect workers from sub-standard wages paid by developers on public work projects. It requires payment of a prevailing wage when public funds pay for, even in part, construction of a building, and any analysis of the 'totality of the circumstances' of the questioned transaction should be viewed under that rubric. As eloquently stated in *Phoenix Field Office* referencing the Davis-Bacon Act, "[w]hile the public generally has an undeniable interest in paying as little as possible for the construction of public works," the PWA is designed "to subordinate that interest to the extent necessary to set minimum wage standards for such construction work." *Phoenix Filed Office*.

Here, the Lease Agreement utilizes several tactics to shift the risk from Developer to the State Police. First, the use of guaranteed years. Through the guarantee of at least ten years of rent from the State Police, Developer ensures a significant flow of payments in return for the construction of the facility. Second, as noted previously, the Lease Agreement requires the State Police to reimburse Developer for its unamortized costs of construction if the Lease is terminated before the end of the 20-year initial term. Once again, the payment of unamortized costs is not "rent," as it is not a payment for the use or occupancy of the barracks. Instead, it is clearly a payment designed to pay for the costs of constructing the headquarters facility.

Accordingly, the Lease fails the "all of the risk" test proposed by Developer and required by the plain text of the PWA. It is clear under the economic realities of the project that State Police funds pay for construction of the barracks at least in part, if not in full. Accordingly, the Commonwealth Court erred in concluding that the barracks lease was not subject to the PWA for this reason as well.

Given our conclusion that the Commonwealth Court erred in applying the PWA to the facts of record, we need not reach the third issue presented in this appeal.

## VII. CONCLUSION

Based on the plain language of the PWA, prevailing wage requirements apply when public funds are paid to obtain non-maintenance construction, reconstruction, demolition, alteration or repair services. Risk allocation is but one of many factors to be considered to determine whether public funds paid for construction under *Hance*. Since the totality of the circumstances here establish that public funds paid for construction costs of the State Police headquarters, the Lease is subject to PWA requirements. Accordingly, we reverse the Commonwealth Court's order.

Justices Donohue, Dougherty and Wecht join the opinion.

Justice Mundy files a concurring opinion in which Chief Justice Todd and Justice Brobson join.